JENKINS, Norman A. and
Jenkins, Ella, his wife

v.

KYW, A DIVISION OF GROUP W,
WESTINGHOUSE BROADCAS-
TING & CABLE, INC.

Appeal of Norman A. JENKINS
and Ella Jenkins.

No. 87–1005.

United States Court of Appeals,
Third Circuit.

Argued June 19, 1987.

Decided Sept. 21, 1987.

Paul R. Rosen, Niels Korup (argued), Spector, Cohen, Gadon & Rosen, P.C., Philadelphia, Pa., for appellants.

Alan M. Lieberman (argued), Joyce S. Meyers, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Stephen A. Hildebrandt, Westinghouse Broadcasting Co., Inc., Washington, D.C., of counsel), for appellee.

Before: SEITZ and MANSMANN, Circuit Judges, and BISSELL, District Judge.*

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal, the Honorable Norman A. Jenkins, of the Court of Common Pleas of Philadelphia County, Pennsylvania, and his wife, Ella Jenkins,[1] contest the district court's grant of summary judgment for KYW, a division of Group W, Westinghouse Broadcasting and Cable, Inc. ("KYW") in this diversity suit brought pursuant to Pennsylvania law. Jenkins claimed that KYW defamed him in a television broadcast aired in the Philadelphia area. For the reasons set forth below, we will affirm the judgment of the district court.

### I.

In his complaint Judge Jenkins alleged that KYW, a Philadelphia television station, defamed him in a television broadcast entitled "Hard Crime/Soft Time (The Case of Clayton Hewlett)" which aired on February 1, 1984. The broadcast, prepared by KYW reporters Sheryl Stein and Anthony Lame and narrated by Willie Monroe, traced the history of Clayton Hewlett ("Hewlett") through the criminal justice system from 1962, when Hewlett was first committed to a correctional institution for a juvenile offense, until August 1, 1981, when he murdered nine-year-old Olivia Lorray Rice in Pittsburgh, Pennsylvania. The plaintiff claimed that the broadcast defamed him by implying that because he had sentenced Hewlett to probation and Hewlett therefore was at large instead of in prison at the time of the girl's death, Judge Jenkins was directly responsible for the death.

KYW asserted its First Amendment privilege to express opinions and moved for summary judgment, maintaining that there were no material issues of fact, since the

factual statements in the broadcast were supported by official court records.

The district court, citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (*"Anderson"*), found that in deciding whether there is a factual dispute for submission to a jury in a defamation case involving a public figure, the test of actual malice must be met by a "clear and convincing" evidentiary standard. The district court found that the statements in the broadcast were substantially true and concluded that there was no evidence of actual malice to support an actionable claim for defamation. This appeal followed.

### II.

On review of a grant of summary judgment, an appellate court is required to apply the same test the district court should have utilized initially. Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). We are cognizant, as well, of the standards set forth in *Anderson v. Liberty Lobby* regarding summary judgment in a libel action by a public figure.

■ Judge Jenkins primarily raises the issue of the substantive evidentiary standard of proof on motions for summary judgment. This question was recently addressed by the Supreme Court in *Anderson v. Liberty Lobby, Inc. Anderson* involved a defamation suit by a public figure, to which the *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), standard applies. That standard requires the plaintiff to show, with "convincing clarity," that the defendant acted with knowledge that the defamatory statements were false or with reckless disregard of

* Honorable John W. Bissell of the United States District Court for the District of New Jersey, sitting by designation.

1. We will refer to the plaintiffs in the singular.

their truth or falsity. *New York Times,* 376 U.S. at 285–86, 84 S.Ct. at 728–29.

In *Anderson,* the defendants' motion for summary judgment on the basis that actual malice was absent as a matter of law was supported by an affidavit of an employee of the defendants attesting to the veracity of the facts, detailing the sources for the statements alleged to be libelous and stating the amount of time he had spent researching. The plaintiffs responded to the motion essentially by charging that the defendants had failed to verify their information adequately before publishing and that inaccuracies existed due to the use of unreliable sources.

The district court held for the defendants, finding that actual malice was precluded as a matter of law due to the thorough research done and reliance on numerous sources. On appeal, the U.S. Court of Appeals for the District of Columbia held that for the purpose of summary judgment the requirement that actual malice be proved by clear and convincing evidence, rather than by a preponderance of the evidence was irrelevant, and that to defeat summary judgment the plaintiffs did not need to show that a jury could find actual malice with convincing clarity. The Supreme Court disagreed.

The Court found first that the substantive law will identify which facts are material. Thus only disputes over facts that would affect the outcome of the suit under the governing law would preclude the entry of summary judgment. The Court then held that summary judgment would not lie if the evidence were such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 106 S.Ct. at 2510. The Court stated clearly that there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. The need for a trial is therefore informed by the threshold determination of whether the factual issues may reasonably be resolved in favor of either party.

Finally, the court announced that the "convincing clarity" requirement was rele-vant in ruling on a motion for summary judgment.

> When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times* .... Thus, where the factual dispute concerns actual malice ... the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Anderson,* 106 S.Ct. at 2513, 2514.

### III.

We begin our analysis mindful of our earlier decision in *Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072 (3d Cir.1985), wherein we remarked that

> [a]lthough replete with First Amendment implications, a defamation suit fundamentally is a state cause of action.... An adjudication of a defamation case involves both state and federal law inquiries. A court must determine: (1) whether the defendants have harmed the plaintiff's reputation within the meaning of state law; and (2) if so, whether the First Amendment nevertheless precludes recovery.

*Id.* at 1077, *quoting Steaks Unlimited v. Deaner,* 623 F.2d 264 (3d Cir.1980). Our first determination in this diversity case must therefore be whether the plaintiff has made out a proper claim under state law.

### A.

To recover in a libel action under Pennsylvania law, the plaintiff's initial burden is to prove the defamatory character of the communication. *See Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971). To this end, we will describe the broadcast in some detail. The broadcast at issue was a 15 to 20 minute portion of the nightly five o'clock KYW news program.

The Hewlett segment was the first portion of an eight-part investigative report on Pennsylvania's criminal justice system.

The story began with reportage about Olivia Lorray Rice, the child who was killed, and included interviews with her family, photos of her neighborhood, and a verbal report of her death at Hewlett's hands. Then followed material descriptive of Hewlett's criminal record, including a report of light sentences imposed by several different Common Pleas Court judges. The segment superimposed photographs of those judges. This segment concluded with a description of Hewlett's first encounter with Judge Jenkins, during which Judge Jenkins stated his views as to the heinousness of Hewlett's crimes. The narrator also announced the potential sentence which Judge Jenkins could have imposed upon Hewlett, and the actual sentence imposed. Superimposed upon the screen were drawings of a courtroom scene with Judge Jenkins and Hewlett, and a photograph of Judge Jenkins. The program continued with then-District Attorney Edward Rendell commenting that he did not know "what was in Judge Jenkins' mind" (in regard to sentencing of Hewlett) and otherwise commenting upon the criminal justice system.

The narration of Hewlett's offenses continued, first with information and interviews with a woman whom Hewlett had assaulted, and a detective involved in that particular incident, and then with information about Hewlett's arrest for violating his probation status. The reporter then noted that Hewlett reappeared before Judge Jenkins on the violation of probation charge, and that the judge allowed Hewlett to remain on probation though he knew or was presumed to know of the various violations. The reporter also noted that the notes of testimony for that day could not be found, and no explanation as to their disappearance had been offered. The photographs at this point were those of an empty courtroom and of Judge Jenkins. This segment was also followed by Mr. Rendell's com-

ments, this time that "Judge Jenkins failed again, and as [the narrator] said, the results here were tragic."

The final portion of the program described the circumstances surrounding Olivia's disappearance, the eventual confession of the murder by Hewlett, the funeral, and the building of a memorial to the girl in Pittsburgh. Included was an interview with the head of the Pittsburgh Housing Authority, indicating that "whomever the judge [was] ... his conscience should bother him...." Finally, the narrator reported that Judge Jenkins did not know about the murder case, and would not discuss it on camera. Mr. Rendell again gave his comments about "the system," and the narrator closed by noting that no one from the Pennsylvania Parole Board would talk about the Hewlett matter, or any other case.

On this appeal, Judge Jenkins attempts to raise factual issues concerning the truth or falsity of the statements broadcast. Judge Jenkins focuses on the defamatory nature of the broadcast, particularly then-District Attorney Rendell's criticisms and the overall defamatory context of the combined effect of the spoken words juxtaposed with the visual image on the television screen.

Under Pennsylvania law, a statement is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community. *See Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971). The threshold determination of whether a statement is capable of a defamatory meaning depends on the general tendency of the words to have such an effect. Whether a statement is capable of a defamatory meaning is a question the judge, as distinguished from the jury, must determine. *Marcone*, 754 F.2d at 1078. While the district court judge here did not expressly find the broadcast to be capable of a defamatory meaning, his further analysis of the case implicitly posits the defamatory nature of the broadcast. In the position of an appellate court, it may be

difficult for us to perceive the general tendency of the broadcast in the same manner as the viewing public. We are nevertheless willing to assume *arguendo* the capability of defamatory meaning here because the second prong of the prima facie case—actual malice—has clearly not been met and the end result reached would be the same.

### B.

Given the defamatory capability of the broadcast at issue, we must then determine whether the First Amendment privileges to express opinions and stimulate debate on public issues accorded to the press and other media nonetheless preclude recovery when the statements concern the conduct of a public official. In this regard we consider the *New York Times* standard of actual malice, applied within the context of a motion for summary judgment. *See Anderson v. Liberty Lobby.*

■ The balance between a public official's right and need to protect his reputation, and the First Amendment's concerns for open debate on public issues was struck by the Supreme Court in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. In that decision, the Court granted First Amendment coverage to defamation concerning the conduct of public officials. Thus, in a defamation action public officials must prove that the statements were published with actual malice, defined by the Court as knowledge that the statement was false or with reckless disregard of whether or not it was false. *Id.* at 279–80, 84 S.Ct. at 725–26. This standard was refined by the Court in *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), wherein it was explained that reckless disregard of the truth could be found if there was evidence to show that the defendant in fact entertained serious doubts as to the truth of the publication.

As noted above, in the context of a motion for summary judgment, "the appropri-

ate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson*, 106 S.Ct. at 2514.

■ Applying the standards enunciated in *Anderson*, we find no error in the district court's grant of summary judgment to the defendant in this case. We discern no evidence which, by a clear and convincing standard, would show that the defendant had serious doubts about the truthfulness of the broadcast. The plaintiff has not shown that the investigation by the television reporters disclosed the falsity of a statement at issue, nor that they entertained serious doubt as to any statement's truth. Moreover, many of the allegedly defamatory statements are clearly opinions. These opinions, however biting, are protected by the First Amendment.

Judge Jenkins points to several issues which he claims establish KYW's knowledge and reckless disregard of the truth or falsity of its statements. The most important of these contentions concern Assistant District Attorney William Heiman. Judge Jenkins asserts that he approached Heiman to communicate to KYW that what had actually occurred during the Violation of Probation hearing was that Hewlett had been continued on probation on the joint recommendation of Assistant District Attorney Richard Myers and Public Defender Jeffrey Staniels, whereas the inference from the program was that the District Attorney's office had opposed such a disposition. Jenkins claims that Heiman then told reporters Lame and Stein that Judge Jenkins followed that recommendation.

The broadcast stated:

On September 29, 1980, Hewlett was back in front of Judge Jenkins charged with violating his probation. As a result of this violation, Jenkins could have resentenced Hewlett to a substantial prison term on the sexual assault charges he

was convicted of four years earlier. Remember this is the same Judge Jenkins who had called Hewlett a menace to society and a danger to the community. We can't tell you what was said in this courtroom that day. Mysteriously, there are no notes of testimony ... But we do know that Judge Jenkins was aware that Clayton Hewlett had taken off and never reported on probation for two years. Jenkins also knew that Hewlett had never been admitted to a hospital for psychiatric treatment. Nevertheless, Judge Jenkins allowed Hewlett to remain on probation and put him back on the street.

Nothing in the record before us supports the allegations of the plaintiff such that material issues of fact are raised. The broadcast did not state that Jenkins continued Hewlett's probation over the objection of the District Attorney's office, nor did the broadcast state what the position of the District Attorney's office was. Indeed, the record indicates that Assistant District Attorney Myers had no recollection of what had occurred at the hearing and that Assistant District Attorney Heiman was not present at that proceeding. We therefore find no evidence of actual malice in this regard.

Jenkins' other assertion that merits our consideration regards then-District Attorney Edward Rendell's criticisms. Jenkins maintains that Rendell's statement that Judge Jenkins "failed again" by continuing Hewlett's probation, and especially his statement that "[i]f it's necessary to put someone in jail for a long time and hurt that individual, well, darn it, that's your oath. You gotta do that because the stakes are enormous" are defamatory *per se* because they imply the factual finding of the violation of the judge's oath.

■ The Supreme Court, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1973) noted that,

> [u]nder the First Amendment there is no such thing as a false idea. However

pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues.

*Gertz,* citing *New York Times,* 376 U.S. at 270, 84 S.Ct. at 720–21. Thus, the publication of expressions of pure opinion are protected, whereas opinions based on erroneous facts are actionable if published with actual malice. We therefore turn directly to Mr. Rendell's comments.

■ Judge Jenkins attempts to construe Mr. Rendell's "failure" comment as actionable by asserting that the facts upon which it is based were wrong, and that KYW knew of their falsity. As noted previously, however, the assistant district attorney involved in the case had no recollection of the violation of probation hearing, nor was KYW able to ascertain precisely what was said in the courtroom at that hearing. We are therefore unable to find that this comment rises to the level of actual malice required under *New York Times.*

Mr. Rendell's comments about judges' oaths have been misconstrued by the plaintiff as well. Mr. Rendell did not state that Judge Jenkins had violated his oath of office. During the broadcast, the narrator recited a long portion of Clayton Hewlett's police record, ending that portion with Judge Jenkins' imposition on Hewlett of a jail sentence, a probation term and a period of psychiatric treatment and it was noted that the sentence imposed was for less than the maximum potential sentence. Mr. Rendell then remarked,

> I don't know the facts of this case. I don't know what was in Judge Jenkins' mind and, as I understand, he is not one of your more lenient sentencing judges and, by and large, he's a pretty decent judge. If it's necessary to put someone in jail for a long period of time and hurt

that individual, well darn it, that's your oath. You gotta do that because the stakes are enormous. Everything that's wrong with the way that judges view violent crime and serious offenses is epitomized here.

It is obvious that the first portion of Mr. Rendell's remarks were in fact a favorable expression of Mr. Rendell's opinion of Judge Jenkins. The remarks relevant to a judge's oath were comments about the nature of a judge's duty to society. They were Mr. Rendell's personal opinion about the discharge of a judge's sentencing obligation. We note here that it is a judge's obligation to sentence within the limits prescribed by the law. Thus a judge's determination to sentence at the lower end of the range is no violation of one's official duty, nor is the opposite determination. It is precisely because a range of sentencing is possible that Mr. Rendell's opinions on the subject are merely opinions. As the district court noted also, all the judges who handled Mr. Hewlett's sentencings were the subjects of Mr. Rendell's statements. We conclude that Mr. Rendell's statements regarding sentencings are protected expressions of opinion.

### IV.

Finally, Judge Jenkins argues that two discovery requests were erroneously denied. We find no merit in this contention. For the reasons stated above, we will affirm the judgment of the district court.