**SEYMOUR KLAGSBRUN and
Judith Oshry, Plaintiffs,**

v.

**VA'AD HARABONIM OF GREATER MONSEY, Moses Tendler, Berel Wein, Avrohom Pessin, Hirsch Chapler, Alfred Cohen, and Shulamith Klagsbrun, Defendants.**

No. CIV. A. 97–3134.

United States District Court,
D. New Jersey.

June 14, 1999.

Seymour Klagsbrun, Judith Oshry, Aberdeen, NJ, Pro se.

Marc D. Stern, Clifton, NJ, Paul A. Lisovicz, McElroy, Deutsch & Mulvaney, Morristown, NJ, for Defendants.

## OPINION

ACKERMAN, District Judge.

This matter comes before the court on defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(2) for lack of personal jurisdiction, or in the alternative, for failure to state a cause of action pursuant to Rule 12(b)(6). The defendants joining in this motion are the Va'ad Harabonim of Great Monsey ("Va'ad"), Moses Tendler, Berel Wein, Avrohom Pessin, Hirsch Chapler, and Alfred Cohen.[1]

For the reasons discussed more fully below, this court will consider the defendants' motion to dismiss under Rule 12(b)(6) for failure to state a cause of action as one made pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. The court will grant the Rule 12(b)(1) motion and dismiss the complaint for lack of subject matter jurisdiction. Accordingly, the defendants' motion to dismiss for lack of personal jurisdiction is rendered moot.

At the outset, this court notes that the defendants' Rule 12(b)(6) motion should be viewed more appropriately as one made under Rule 12(b)(1). In substance, they argue that the plaintiffs' defamation action should be dismissed because it implicates concerns which are ecclesiastical in nature. Consequently, they argue, the First

---

1. It does not appear that Shulamith Klagsbrun has been properly served with process in this case, and by order dated February 13, 1998, United States Magistrate Judge Dennis Cavanaugh denied the plaintiffs' request for an extension of time to serve Shulamith Klagsbrun with process. By order dated March 23, 1998, Magistrate Judge Cavanaugh denied the plaintiffs' motion for reconsideration.

Amendment to the Constitution prohibits this court from adjudicating this matter. Various other courts considering similar issues appear to have grounded their analyses on whether they had subject matter jurisdiction over the claim, rather than on whether the plaintiff's claim stated a viable cause of action. *See, e.g., Bell v. Presbyterian Church (U.S.A.),* 126 F.3d 328 (4th Cir.1997); *Hutchison v. Thomas,* 789 F.2d 392 (6th Cir.1986); *40th St. and Fairmount Ave. Church of God v. Stover,* 316 F.Supp. 375 (E.D.Pa.1970).

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is separate and distinct from one for failure to state a cause of action under Rule 12(b)(6). *See Johnsrud v. Carter,* 620 F.2d 29, 32–33 (3d Cir.1980). A Rule 12(b)(1) motion goes to the court's " 'very power to hear the case.' " *Robinson v. Dalton,* 107 F.3d 1018, 1021 (3d Cir.1997) (quoting *Mortensen v. First Federal Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). A dismissal under Rule 12(b)(6), on the other hand, is a disposition on the merits, and therefore presumes the court's power to hear the matter. See *Johnsrud,* 620 F.2d at 33 (citing *Hubicki v. ACF Indus., Inc.,* 484 F.2d 519, 523 (3d Cir.1973)). Accordingly, they should not be confused or used interchangeably. This court will follow the lead of the other courts cited above and consider the defendants' present motion, which appears to directly challenge this court's power to entertain this matter, under Rule 12(b)(1). As one treatise has acknowledged, Rule 12(b)(1) "like Rule 12(b)(6), . . . is flexible, often serving as a vehicle for raising various residual defenses." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (2d ed. 1990 & Supp.1998). Of course, this court is permitted to consider the defendants' motion, ostensibly filed pursuant to Rule 12(b)(6), under Rule 12(b)(1). *See Oldham v. ACLU Found. of Tenn., Inc.,* 849 F.Supp. 611, 613 n. 3 (M.D.Tenn.1994) (converting Rule 12(b)(6) motion to Rule 12(b)(1) motion, noting that "a party is not to be prejudiced for misi-

dentifying a Rule 12(b)(1) motion"); *Riddle v. Trans World Airlines, Inc.,* 512 F.Supp. 75, 77 (W.D.Mo.1981).

## I.  BACKGROUND

The present libel and slander action arises from what appears to be a long and bitter dispute concerning the dissolution of the marriage of Seymour and Shulamith Klagsbrun. At the heart of the complaint is the allegation that a flyer or notice circulated by the Va'ad and the individual defendants defamed the plaintiffs. The Va'ad is an unincorporated association of Orthodox rabbis who serve a segment of the Orthodox Jewish community in the greater Monsey/Spring Valley area of Rockland County, New York, and is comprised, *inter alia,* of the individual defendants in this case, with the exception of Shulamith Klagsbrun. The individual defendants are ordained Orthodox rabbis who occupied various leadership positions in the Va'ad. At this point, a brief description of the Va'ad may be helpful.

The Va'ad, as a body comprised of Orthodox rabbis, was designed to facilitate common practices among its member congregations in the relatively insulated Orthodox Jewish community in Rockland County. According to the affidavit of Rabbi Moses Tendler, Orthodox Jewry presently has no central religious authority. Each synagogue's rabbi, therefore, acts as the supreme authority for his particular synagogue. His enforcement power, however, extends only so far as his decrees are voluntarily accepted by members of his congregation. Because each Orthodox congregation is independent, the ability of individual rabbis to maintain and enforce religious standards in matters which affect the Orthodox community as a whole is quite limited. While the Va'ad membership does not represent every Orthodox congregation, its members serve the largest number of Orthodox Jews in the greater Monsey area. As a body of Orthodox rabbis, the Va'ad's proceedings are gov-

erned exclusively by the *Shulchan Arukh*, the Code of Jewish law.

The plaintiff Seymour Klagsbrun describes himself in the complaint as an adherent of the Orthodox Jewish religion. Seymour Klagsbrun and Shulamith Klagsbrun were married in an Orthodox Jewish ceremony in June, 1957. After nearly thirty years of marriage, Shulamith Klagsbrun obtained a civil divorce in May, 1995. The defendants contend that in addition to the civil divorce, Shulamith Klagsbrun sought a religious divorce, or what is known as a *get*, from a rabbinical court in conformance with her religious beliefs. The defendants further contend that a rabbinical court ordered Mr. Klagsbrun to grant his wife a *get*. Mr. Klagsbrun, however, refused to grant a *get*, which under Jewish law must be given at the free will of the husband. Mr. Klagsbrun's refusal has precluded Shulamith Klagsbrun from remarrying in conformity with the tenets of her faith.

Although he never provided a *get* to Shulamith Klagsbrun, there is no dispute that Seymour Klagsbrun has remarried. Seymour Klagsbrun contends, however, that he obtained a special rabbinic dispensation permitting him to remarry.

In May, 1996, the children of Seymour and Shulamith Klagsbrun approached Rabbi Hirsch Chapler and informed him that Judith Oshry, a congregant in his synagogue, was married to their father. Rabbi Chapler, a defendant in this action, is an ordained Orthodox Rabbi, and since 1989, has been the official rabbi of the Young Israel of Spring Valley, an Orthodox Jewish congregation in Spring Valley, New York. The children further informed Rabbi Chapler that Seymour Klagsbrun had not given their mother a *get* and allegedly provided the rabbi with various documents from rabbinic tribunals and individual rabbis confirming this fact. Rabbi Chapler has stated in his affidavit that he confirmed the authenticity of one of those documents, and further, that Rabbi Avrohom Pessin, another defendant in this ac-

tion, confirmed the validity of the other documents. Upon receiving this information and reviewing the documents provided by the children, Rabbi Chapler referred the matter to the Va'ad.

The Va'ad thereafter convened a meeting with Seymour Klagsbrun. According to Rabbi Chapler, the Va'ad acted as a *Beis Din*, or a religious court, when it met with Mr. Klagsbrun. The *Beis Din* was conducted in accordance with the requirements of *Shulchan Arukh*, the Code of Jewish law for a rabbinic court. The Va'ad informed Seymour Klagsbrun that he had to either give his wife a *get* or present evidence that he had obtained a valid rabbinic dispensation permitting him to remarry. Seymour Klagsbrun objected and attempted to attack the validity of the prior rabbinic judgment ordering him to give a *get*. The Va'ad refused to reconsider the prior rabbinic court's judgment, determining that such an endeavor was beyond its competence. The Va'ad asked Mr. Klagsbrun to produce the special rabbinic dispensation permitting him to remarry. Mr. Klagsbrun allegedly refused to do so.

Specifically at issue in this case is a notice, dated June 21, 1996 and written on the letterhead of "Va'ad Harabonim of Greater Monsey," circulated by various members of the Va'ad after Seymour Klagsbrun refused their entreaties. That notice provides as follows in its entirety:

> Mr. Seymour Klagsbrun has taken up residence in the Monsey/Spring Valley community. After numerous conversations with Mr. Klagsbrun the following facts are clear to us:
>
> 1. Mr. Klagsbrun has never given a Jewish divorce to his wife Shulamith Klagsbrun.
>
> 2. Mr. Klagsbrun has since remarried, claiming that he has the necessary permission from a rabbinical court to do so.
>
> 3. Seymour Klagsbrun has refused to tell us the name of the Rabbi who per-

formed the marriage with his second wife.

4. Mr. Klagsbrun has refused to show us the claimed written rabbinic permission allowing him to remarry.

5. The issues between Mr. & Mrs. Klagsbrun were addressed by a reputable Bais Din which ordered Mr. Klagsbrun to give a Jewish divorce to his wife. Mr. Klagsbrun has not complied with the order of that Bais Din.

6. Mr. Klagsbrun has refused to inform us of the name of his designated representative to a new Bais Din to adjudicate any outstanding property issues between him and Mrs. Shulamit [sic] Klagsbrun.

7. Mr. Klagsbrun has repeatedly threatened the Va'ad Harabonim with the bringing of legal actions in a civil secular court.

In light of all of the above it is obvious that Seymour Klagsbrun is not entitled to any honors or participation in synagogue services and that all possible social sanctions should be place [sic] against him until he complies with the orders of Bais Din and grants a Jewish divorce to his wife, Shulamith Klagsbrun.

The plaintiffs allege that these statements are false and defamatory. They allege that as a direct result of these false statements, they have been shunned by their community.

## II. *DISCUSSION*

In support of their motion to dismiss this defamation action, the defendants argue that this court cannot decide the merits of this case without engaging in questions of clear theological import, an endeavor, they argue, which is prohibited by the Establishment Clause of the First Amendment. Specifically, the defendants contend that the propositions contained in the notice are religious in nature, and an inquiry into the truth or falsity of those propositions, they assert, is not a matter

for secular courts under a long line of case law construing the Establishment Clause.

The plaintiffs dispute the characterization of their defamation action as ecclesiastical in nature. While their line of argument is not entirely clear, it appears to make a distinction between the allegedly defamatory notice and the "alleged decision by the Defendants that 'plaintiff illicitly entered into a second marriage.'" This case, the plaintiffs contend, is about the former and not the latter.

Based upon this court's extensive review of the record developed thus far in this case, the defendants' motion to dismiss based on the Establishment Clause of the First Amendment is granted.

The First Amendment, in relevant part, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." Elegant in its simplicity, these few words express a bedrock principle upon which this republic was founded. While the provision is deceivingly straightforward in language and concept, the application of both of the religion clauses found in the First Amendment has been far from an effortless endeavor. The Establishment Clause of the First Amendment, which is directly relevant to the case at bar, "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly,* 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). But as recognized by the Supreme Court,

no fixed, per se rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. The purpose of the Establishment Clause "was to state an objective, not to write a statute...." The line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The

Clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."

*Id.* at 678–79, 104 S.Ct. 1355 (citations omitted). Accordingly, First Amendment jurisprudence has traditionally "call[ed] for line drawing" by the courts to best effectuate its rather lofty goals. *Id.* at 678, 104 S.Ct. 1355. The case at bar asks this court to once again attempt to properly demarcate the boundary between the secular and the ecclesiastical.

■ It must be pointed out at this stage that this matter is before this court under the diversity of citizenship doctrine. *See* 28 U.S.C. § 1332(a)(1). A federal court sitting in diversity must apply the substantive law of the forum state, in this case New Jersey. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *McKenna v. Pacific Rail Serv.,* 32 F.3d 820, 825 (3d Cir.1994). Consequently, this court must apply New Jersey's substantive law to this action. *See, e.g., Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church,* 98 F.3d 78 (3d Cir.1996), *cert. denied,* 519 U.S. 1058, 117 S.Ct. 688, 136 L.Ed.2d 612 (1997).

■ In the seminal case of *Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 728–29, 20 L.Ed. 666 (1871), the Supreme Court cogently stated as follows:

The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to

it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

In this vein, the Establishment Clause requires, among other things, that a law or regulation not foster excessive governmental entanglement with religion. Excessive entanglement may occur when judicial review of a claim requires "a searching ... inquiry into church doctrine." *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich,* 426 U.S. 696, 723, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). While the First Amendment prohibits excessive entanglement with religion, it by no means prohibits courts from *any* involvement in religious disputes. The Establishment Clause merely prohibits courts from determining underlying questions of religious doctrine and practice. *See Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Accordingly, the question to be resolved in this case is where to draw the line between the constitutional right to preserve the autonomy of religious organizations, on the one hand, and the individual's interest in vindicating secular rights.

In *Scotts African Union Methodist Protestant Church,* the Court of Appeals for the Third Circuit addressed a similar question in a case arising under New Jersey law. In that case, a local church disaffiliated from a regional administrative body of a religious organization known as the African Union Methodist Protestant

("AUMP") Church.[2]  The local church thereafter filed suit seeking a declaratory judgment that the administrative body held no interest in property transferred to it by the local church, and that a quitclaim deed executed by the church's minister was invalid.  The defendant administrative body sought to dismiss the case on grounds that the First Amendment required the court to give deference to the determinations of the administrative body, the highest authority in the hierarchical church.  *Scotts African Union Methodist Protestant Church*, 98 F.3d at 82.

After carefully surveying the applicable authorities, the Third Circuit, applying New Jersey law, disagreed, and found that New Jersey courts would apply "neutral principles" to resolve intrachurch disputes, and not simply defer to the decisions of a religious organization's highest body.  *Id.* at 94.  While the case specifically concerned an intrachurch property dispute, the Third Circuit made clear that the neutral principles approach, rather than the deference approach, would apply without regard to the type of case before the court.[3]  *Id.* at 91–92 (determining that recent opinions by New Jersey Supreme Court instruct that "the appropriate level of review turns not on the type of civil dispute involved but on the extent to which the dispute implicates questions of religious doctrine or polity").

Neutral principles "are wholly secular legal rules whose application to religious parties or disputes does not entail theological or doctrinal evaluations."  *Elmora Hebrew Ctr. Inc. v. Fishman*, 125 N.J. 404, 414–15, 593 A.2d 725 (1991).  Under the neutral principles approach, civil courts have no jurisdiction over, and no concern with, spiritual matters and the administration of a religious organization's affairs that do not affect the civil or property rights of individuals.  *See Chavis v. Rowe*, 93 N.J. 103, 109, 459 A.2d 674 (1983); *see also Welter v. Seton Hall Univ.*, 128 N.J. 279, 293, 608 A.2d 206 (1992) (determining that courts should refuse to enforce secular rights "when the underlying dispute turns on doctrine or polity").  However, temporal matters of a religious organization affecting civil, contract, or property rights may be resolved in civil courts.  *See Chavis*, 93 N.J. at 109–110, 459 A.2d 674.  Thus, secular courts may decide civil disputes between a religious body and its members or its clergy if those disputes involve purely secular issues and can be resolved without entanglement with matters of faith, discipline, or doctrine.  *See F.G. v. MacDonell*, 150 N.J. 550, 559, 696 A.2d 697 (1997); *Elmora Hebrew Ctr.*, 125 N.J. at 415–16, 593 A.2d 725 (citing *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)).  As stated by the court in *Kleppinger v. Anglican Catholic Church, Inc.*, 314

**2.**  The AUMP Church was a regional association of several local churches located in the mid-Atlantic states and tied by their common adherence to the AUMP denomination and doctrine.

**3.**  While related concepts, the deference approach and the neutral principles doctrine are distinct analytical tools used to determine whether courts may consider religious disputes.  They are related in the sense that they both seek to ensure that courts refrain from deciding issues involving religious doctrine, belief, discipline, faith, or custom to resolve disputes involving religious organizations.  *See Milivojevich*, 426 U.S. at 710, 96 S.Ct. 2372.  The difference between the two principles lies in their respective approaches.  The deference approach, as enunciated by the Su-

preme Court in *Watson*, requires courts to defer to the highest governing body of the religious organization that has made a decision concerning the dispute.  80 U.S. at 727, 13 Wall. 679.  Under *Watson*, then, once the highest governing body of a religious organization has passed on a dispute, a civil court must "accept such decisions as final, binding upon them, in their application to the case before them." *Id.*

The neutral principles doctrine requires courts to apply "neutral principles of law" to decide disputes involving religious organizations, instead of simply deferring to the ecclesiastical tribunals, as under the deference approach.  *See Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. at 449.

N.J.Super. 613, 626, 715 A.2d 1033 (Ch. Div.1998):

> [T]he Establishment Clause[ ] forbid[s] government resolution of disputes religious in tenor and content. This constitutional stricture, however, does not prohibit judicial involvement in controversies between religious groups wholly secular in character such as church property disputes and civil contract actions.

The neutral principles doctrine is grounded in the notion that not every dispute arising within a religious organization implicates First Amendment concerns. *See Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. at 449, 89 S.Ct. 601. Rather, First Amendment values are jeopardized when the resolution of the dispute turns on an inquiry into religious doctrine and practice. *Id.* Accordingly, the issue in this case, as far as the First Amendment is concerned, is whether plaintiffs' defamation claim is ecclesiastical in nature concerning "discipline, faith, internal organization, or ecclesiastical rule, custom or law," *Milivojevich,* 426 U.S. at 713, 96 S.Ct. 2372, or a "purely secular dispute[ ] between third parties and a particular defendant, albeit a religiously affiliated organization," *General Council on Finance and Administration of United Methodist Church v. California Superior Court,* 439 U.S. 1369, 1373, 99 S.Ct. 35, 58 L.Ed.2d 63 (1978).

To determine whether the Establishment Clause prohibits this court from exercising jurisdiction over this matter, this court must consider the specific elements of the plaintiffs' claim. As stated by the Third Circuit in *Scotts African Union Methodist Protestant Church,* the "extent to which a court may permissibly inquire into disputes [arising within a religious organization] turns on the specific elements of the inquiry itself and the degree to which it might trench upon doctrinally sensitive matters, rather than on conclusory labeling of the whole dispute as either 'secular' or 'ecclesiastical.'" 98 F.3d at 95. Put simply, this court must determine the nature and extent of the doctrinal relevance underpinning this dispute. *Id.; see, e.g., MacDonell,* 150 N.J. at 567, 696 A.2d 697 (remanding for hearing on question of whether clergyman breached fiduciary duty to parishioner based on statements made during sermon); *Farley v. Wisconsin Evangelical Lutheran Synod,* 821 F.Supp. 1286, 1290 (D.Minn. 1993) (noting that "factual scenarios might exist where resolution of a defamation action against a religious organization would not require the court to undertake an inquiry in violation of the First Amendment").

The defendants have argued the plaintiffs' defamation claims would necessarily implicate ecclesiastical questions concerning the faith, discipline, rule, custom, or law of their religion. To determine the truth or falsity of the defendants' statements, they argue, this court must delve dangerously into questions of doctrine and faith. I agree.

Under New Jersey law,[4] "[a] defamatory statement is one that is false and 'injurious to the reputation of another' or exposes another person to 'hatred, contempt or ridicule' or subjects another person to 'a loss of the good will and confidence' in which he or she is held by others." *Romaine v. Kallinger,* 109 N.J. 282, 289, 537 A.2d 284 (1988) (quoting *Leers v. Green,* 24 N.J. 239, 251, 131 A.2d 781 (1957)). To state a claim for defamation, a plaintiff must prove the following elements: (1) a defamatory statement of fact; (2) the defamatory statement concerned the plaintiff; (3) the statement was false; (4) the statement was communicated to persons other than the plaintiff; and (5) fault. *See Taj Mahal Travel, Inc.*

---

4. "[A]lthough replete with First Amendment implications, a defamation suit fundamentally is a state cause of action." *Jenkins v. KYW,* 829 F.2d 403, 405 (3d Cir.1987) (citation omitted).

*v. Delta Airlines Inc.*, 164 F.3d 186, 189 (3d Cir.1998) (citing *Feggans v. Billington*, 291 N.J.Super. 382, 390–91, 677 A.2d 771 (App.Div.1996)).

Several other courts presented with defamation claims in the context of religious disputes have concluded that First Amendment principles preclude such intrusive inquiries into religious doctrine. For example, in *Farley*, plaintiff, who was employed by the defendant as a pastor, was terminated after the defendant determined that he did not possess the skills needed to conduct an essential aspect of his employment. The plaintiff sued for defamation, claiming that the defendant published both oral and written false and defamatory statements about him during its attempts to remove him. The federal district court in Minnesota dismissed the claim for lack of jurisdiction, reasoning that Supreme Court precedent has consistently interpreted the Establishment Clause to divest the courts of jurisdiction on matters which would necessitate an inquiry into a religious organization's activities concerning religious doctrine or authority. *Farley*, 821 F.Supp. at 1288. The court therefore held that resolution of the defamation claim would require the court to review the defendant's bases for terminating plaintiff and the veracity of the defendant's statements, both of which were ecclesiastical concerns. *Id.* at 1290.

Similarly, in *Schoenhals v. Mains*, 504 N.W.2d 233 (Minn.Ct.App.1993), church members, who had been expelled from their church, brought an action against the pastor and the church alleging, *inter alia*, defamation. The pastor had apparently read a letter to the entire congregation detailing the reasons for the plaintiffs' expulsion from the church. That letter set forth the following reasons for the plaintiffs' expulsion from the church:

1. A lack of financial stewardship with consistency and faithful tithing and offering over a given period of time.

2. A desire on your part to consistently create division, animosity and strife in the fellowship.

3. Direct fabrication of lies with the intent to hurt the reputation and the establishment of Faith Tabernacle of Truth Church and congregation.

4. Backbiting, railing accusations, division, lying, are some of the most serious sins found in the Bible. Where, by all appearances and related conversations, you have fallen into all of the categories.

*Id.* at 234. These statements, the defendants contended, were based upon their interpretation of the Bible, as well as their church's religious beliefs and practices as expressed in the written Articles of Faith and By-laws. *Id.* at 235.

The Minnesota appellate court affirmed the lower court's dismissal of the defamation cause of action, finding that a determination of the truth or falsity of the statements, an essential element of a defamation cause of action, required "an impermissible inquiry into Church doctrine and discipline...." *Id.* at 236. Other courts have arrived at the same conclusion. *See, e.g., Hutchison*, 789 F.2d at 393 (dismissing defamation claim for lack of subject matter jurisdiction finding that claim would necessarily require court to inquire into church doctrine); *Black v. Snyder*, 471 N.W.2d 715, 720 (Minn.Ct. App.1991) (finding that terminated pastor's claim for defamation would implicate ecclesiastical concern); *McManus v. Taylor*, 521 So.2d 449, 451 (La.Ct.App.1988) (dismissing minister's defamation claim against church organizations and officials for lack of subject matter jurisdiction since claim would require court to "investigate the propriety of proceedings conducted by his church in the interpretation and application of church rules").

■ While not entirely clear from the complaint, it appears that the plaintiffs base their suit on three particular aspects of the notice. First, they allege that paragraphs 1 and 2 of the notice charge Seymour Klagsbrun with bigamy, which he

contends is a false statement of fact. Second, the plaintiffs allege paragraph 5 of the notice, which claims that Seymour Klagsbrun had failed to comply with an order of a rabbinical court, is also false and defamatory. And third, the plaintiffs contend that paragraph 6 of the notice, which charges Seymour Klagsbrun with failing to submit to the jurisdiction of a rabbinical court, is also false. As discussed below, these claims, insofar as each presents a distinct claim for defamation, would require this court to undertake an examination of underlying religious doctrine or practice. Accordingly, jurisdiction must be declined.

Paragraph 1 of the notice specifically states that "Mr. Klagsbrun has never given a Jewish divorce to his wife Shulamith Klagsbrun." Paragraph 2 further claims that "Mr. Klagsbrun has since remarried, claiming that he has the necessary permission from a rabbinical court to do so." The plaintiffs claim that these two provisions, in concert, charge Seymour Klagsbrun with bigamy. To make out their claim, the plaintiffs must prove, *inter alia,* that the statements made by the defendants concerning his alleged bigamy were in fact false. To determine whether the statements were false, however, this court would be required to inquire into areas of clear ecclesiastical concern. There is no dispute between the parties that the Klagsbruns received a civil divorce in May, 1995. The statement concerning Seymour Klagsbrun's alleged bigamy, therefore, was plainly made in the context of the Orthodox Jewish faith. Consequently, to ascertain whether the statements were defamatory, this court must ask whether Seymour Klagsbrun was in fact engaged in bigamy *within the meaning of the Orthodox Jewish faith.* For example, this court would need to inquire into the nature of a *get,* how and under what circumstances it may or may not be given, and who has the authority to grant a *get.* In addition, this court would also be called upon to inquire into the nature and propriety of any special dispensation

concerning a person's right to remarry without first giving a *get* to his wife. Determining whether the special dispensation Seymour Klagsbrun allegedly received permitting him to remarry was valid and proper would clearly involve this court in questions of religious doctrine. This court finds that an inquiry into the truth or falsity of the defendants' statement concerning Seymour Klagsbrun's alleged bigamy would entail judicial intrusion into ecclesiastical doctrine and practice, which is unquestionably forbidden ground under the First Amendment.

The plaintiffs' claims with respect to paragraphs 5 and 6 of the notice would also require this court to intrude upon areas of clear ecclesiastical concern. The complaint charges that the statements concerning Seymour Klagsbrun's alleged refusal to comply with an order of a rabbinical court and his alleged refusal to submit to the jurisdiction of a rabbinical court to resolve his property dispute with Shulamith Klagsbrun were false and defamatory. The plaintiffs contend in their complaint that these statements charged Seymour Klagsbrun with violating two of the most sacred rules in the Orthodox Jewish faith, "the violations of which are regarded [as] so heinous that shunning is the prescribed penalty." *Complaint* at ¶ 16. These defamatory statements, the plaintiffs allege, caused Seymour Klagsbrun to be shunned by his community.

It is clear from a review of the plaintiffs' complaint that questions of religious doctrine permeate throughout this issue. Even if, as the plaintiffs contend, paragraphs 5 and 6 of the notice were false, this court would nevertheless be required to evaluate whether failure to comply with an order of a rabbinical court or failure to submit to the jurisdiction of a rabbinical court are wrongs or sins within the Orthodox Jewish faith which lead to the imposition of the punishment of shunning. No doubt this court would also be called upon to inquire into the rules and customs gov-

erning rabbinical courts as they are utilized in the Orthodox Jewish religion. The plaintiffs also go to great lengths in their complaint to challenge the methodology used by the defendants in arriving at their conclusions. However, inquiry into the methodology of how religious organizations arrive at their conclusions concerning questions of religious doctrine are, like the conclusions themselves, beyond the ken of civil courts. *See Scharon v. St. Luke's Episcopal Presbyterian Hospitals,* 929 F.2d 360, 363 (8th Cir.1991) ("It is not only the conclusions that may be reached [by the religious organization] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry.").

Indeed, the plaintiffs' entire defamation claim with respect to paragraphs 5 and 6 of the notice is grounded upon religious doctrine. This is not a case involving a "purely secular dispute[ ] between third parties and a particular defendant, albeit a religiously affiliated organization." *General Council on Finance and Admin.,* 439 U.S. at 1373, 99 S.Ct. 35. Rather, the issues raised are uniquely religious in tenor and content, the resolution of which goes to the very heart of ecclesiastical concern, including discipline, faith, and religious rule, custom, and law. *See Milivojevich,* 426 U.S. at 713, 96 S.Ct. 2372.

The plaintiffs contend that this court would not be required to resolve competing theological propositions.[5] Rather, they argue, this court need only resolve factual questions of (1) whether Seymour Klagsbrun engaged in bigamy; (2) whether a rabbinical court had ordered Seymour Klagsbrun to give Shulamith Klagsbrun a *get;* and (3) whether Seymour Klagsbrun has refused to submit to the jurisdiction of a rabbinical court. The plaintiffs contend that these are questions of fact and not of competing theological propositions, and

thus, do not implicate First Amendment concerns. I find this line of reasoning to be unpersuasive.

The important point here is that resolution of the factual disputes would require this court to inquire into religious doctrine and practice. Simply because, for example, the question of whether Seymour Klagsbrun actually engaged in bigamy is factual in nature in no way diminishes the need for this court to delve into religious doctrine. As noted above, the issue, using just one example, is whether Seymour Klagsbrun engaged in bigamy *within the meaning of the Orthodox Jewish faith,* which by its very nature necessitates an inquiry into religious doctrine. Also unpersuasive is the apparent premise of the plaintiffs' argument, that there must be "competing theological propositions" before the First Amendment is implicated. Rather, the Establishment Clause is implicated whenever courts must interpret, evaluate, or apply underlying religious doctrine to resolve disputes involving religious organizations. Accordingly, the plaintiffs' attempt to distinguish between issues of fact and those involving "competing theological propositions" is not well taken.

### III. *CONCLUSION*

Because the plaintiffs' defamation claims raise inherently religious issues, neutral principles cannot be applied to resolve these claims. They are therefore not properly cognizable in this court, and the plaintiffs' action will be dismissed for lack of subject matter jurisdiction.

---

**5.** This court notes that this argument was raised by the plaintiffs in what appears to be a sur-reply letter brief submitted to the court. The plaintiffs' attempt to respond to the defendants' reply brief was clearly improper un-

der the court rules. This court, however, will consider the arguments raised in the letter brief in light of the plaintiffs' *pro se* status and because of the significance of this issue.