Beverly M. **BRAZAUSKAS**,
Appellant–Plaintiff,

v.

**FORT WAYNE–SOUTH BEND DIO-CESE, INC., Sacred Heart Parish, and Jose Martelli, Appellees–Defendants.**

No. 71A05–9806–CV–280.

Court of Appeals of Indiana.

June 30, 1999.

Stephen M. Terrell, Landman & Beatty, Indianapolis, Indiana, Attorney for Appellant.

William T. Hopkins, Jr., Barnes & Thornburg, Fort Wayne, Indiana, Attorney for Appellees.

## OPINION

BROOK, Judge

### Case Summary

Appellant-plaintiff Beverly M. Brazauskas ("Brazauskas") appeals from three separate orders for summary judgment in favor of appellees-defendants Fort Wayne–South Bend Diocese, Inc. ("the diocese"), Sacred Heart Parish ("the parish"), and Jose Martelli ("Martelli") (collectively referred to as "defendants"). The trial court granted defendants' first motion for summary judgment with respect to Brazauskas' claims for breach of her employment contract with the parish; fraud; promissory estoppel; breach of the covenant of good faith and fair dealing; and intentional infliction of emotional distress. The trial court also granted defendants' third motion for summary judgment on Brazauskas' defamation claim. Finally, the trial court granted defendants' fourth motion for summary judgment on Brazauskas' amended complaint for fraud, constructive fraud, and equitable estoppel. These interlocutory rulings were certified as final and appealable by the trial court pursuant to Ind. Trial Rule 54(B) and will be discussed in greater detail below.[1]

### Issues

Brazauskas raises three primary issues and numerous secondary issues for review, which we combine and restate as whether the trial court erred in granting defendants' first, third, and fourth motions for summary judgment.

### Facts and Procedural History

The essential facts relevant to our review indicate that on or about May 14, 1986, Brazauskas entered into an employment contract with the parish, whereby she was hired as the director of religious education ("DRE") for the period beginning July 1, 1986, and ending June 30, 1987 ("1986 contract").[2] The 1986 contract provided in relevant part:

> This contract is for a one year period. Upon completion of the contract period a new contract will be signed. If either party does not wish to renew the contract, notice in writing shall be given at least 90 days before the existing contract expires.
>
> The PARISH agrees that the DRE shall not be discharged without good and suffi-

---

1. In her reply brief, Brazauskas takes issue with appellees' apparent "effort to circumvent this Court's page limitation [by placing] extended arguments and discussion of cases in single-spaced footnotes." This contention is well taken, and appellees are encouraged to refrain from engaging in this practice in the future.

2. We note that the contract was not signed by either Brazauskas or any parish representative.

cient cause. The PARISH further agrees that the person to whom the DRE is accountable will be responsible for giving the DRE notice, wherever possible, of any dissatisfaction with service or conduct. Moreover, if the DRE is dismissed or the contract terminated, due process procedures shall be followed.

On May 19, 1987, Brazauskas signed a second employment contract with the parish, whereby she was hired as the pastoral associate ("P.A.") for the period beginning July 1, 1987, and ending June 30, 1990 ("1987 contract"). The 1987 contract was also signed by Father William B. Simmons ("Simmons"), the parish pastor, and provided in relevant part:

> This contract is for a [t]hree year period. Upon completion of the contract period a new contract will be signed. If either party does not wish to renew the contract, notice in writing shall be given at least 30 days before the existing contract expires.
>
> In accordance with Parish policy, the performance of the P.A. shall be reviewed and evaluated after six months of employment and again after two years of employment. The PARISH agrees that the P.A. shall not be discharged without good and sufficient cause. The PARISH further agrees that the person to whom the P.A. is accountable will be responsible for giving notice, wherever possible, of any dissatisfaction with service or conduct. Moreover, if the P.A. is dismissed or the contract terminated, due process procedures shall be followed.

On or about July 1, 1990, Brazauskas allegedly executed a second three-year contract with the parish that was to run through June 30, 1993 ("1990 contract").[3] The 1990 contract allegedly contained the same or similar provisions regarding dismissal as the 1987 contract. On June 28, 1992, Martelli replaced Simmons as the parish pastor. Brazauskas left for vacation on or about June 30,

1992, and returned on August 1, 1992. On August 6, 1992, Martelli met with Brazauskas and gave her the choice of either resigning or being fired from her position. Martelli fired Brazauskas on August 7, 1992. The circumstances surrounding Brazauskas' firing are vigorously disputed by the parties. Brazauskas alleges that Martelli's stated reasons for firing her were "that she intimidated him, that they could not get along, and that he did not like working with her"; defendants claim that she was fired for her "expression of unorthodox theological views and conduct offensive to Church teachings."

Brazauskas filed her initial complaint on February 11, 1993. Defendants filed a motion to dismiss on April 20, 1993, which was apparently denied by the trial court on July 12, 1993.[4] On August 5, 1993, Brazauskas filed an amended complaint. She claimed that Martelli had "unlawfully, untruthfully, and intentionally made misleading and slanderous remarks" about her and had "implied that there was something of a bad and sinister nature" about her, "thereby causing her irreparable harm, injury, and damages and rendering her sick, stressed, and physically debilitated." Brazauskas specifically asserted claims against defendants for breach of contract; fraud; promissory estoppel; breach of the covenant of good faith and fair dealing; tortious interference with business relationship; defamation; and intentional infliction of emotional distress.

Defendants filed an answer to the amended complaint on September 7, 1993, in which they denied Brazauskas' allegations and raised nine affirmative defenses. Defendants asserted, *inter alia*, that the trial court lacked subject-matter jurisdiction to hear Brazauskas' claims; that any statements made by defendants were privileged; that her claims were barred by the applicable statutes of limitation; that she had waived any right she may have had to bring her stated claims; and that she had "failed to

---

3. The 1990 contract does not appear in the record. Brazauskas clearly insinuates that Martelli was involved in the disappearance of both her copy and the parish's copy of the contract; in their brief, defendants merely refer to the 1990 contract as "alleged."

4. The chronological case summary merely notes that an order on defendant's motion to dismiss was entered on July 12, 1993; neither the motion nor the order is included in the record.

pursue and exhaust her internal and/or administrative remedies."

On September 7, 1993, defendants filed their first motion for summary judgment, claiming that the trial court lacked subject-matter jurisdiction over several of Brazauskas' claims. They argued that the "First Amendment to the United States Constitution, applicable to the courts of Indiana by the Fourteenth Amendment to the United States Constitution,[5] prohibit[ed]" the trial court from "exercising judicial authority to hear [Brazauskas'] claims" for breach of contract, fraud, promissory estoppel, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress. Defendants argued that because her primary duties had been "religious and clerical," her claims were "all inextricably linked to the circumstances of her termination" as an ecclesiastical matter that could not be considered by the trial court. Defendants also contended that Brazauskas would be able to appeal her termination within the Catholic Church ("Church") pursuant to canon law, and that she had been aware of this remedy.

Brazauskas filed a memorandum in opposition to defendants' first motion for summary judgment on September 28, 1993. She argued that "no doctrinal issue [was] at stake" in her case that would prevent a trial court from addressing her claims; she further claimed that "defendants [had] gone to extraordinary lengths to misconstrue this matter as an ecclesiastical dispute whereas in reality it is clearly a breach of contract action together with other causes of action which civil courts are clearly able to resolve."

The trial court granted defendant's first motion for summary judgment on December 28, 1994, as to all five "theories of recovery" listed in the motion. The trial court observed in its accompanying memorandum that "the plaintiff's position was pastoral and that her duties involved the preservation and propagation of the Catholic faith." The court also noted that "[i]n an hierarchical church, with adjudicatories to resolve disputes, the firing of a pastor is, an ecclesiastical matter"; it further concluded that the First Amendment rendered Brazauskas' contract illusory: "an ephemera which vanishes when the Church invokes the free exercise clause." With respect to the contract's due process clause, the court reasoned that "[i]f the right to procedural due. process is construed to grant a hearing on whether there was good cause for dismissal, then it has taken us full circle and hard against the wall between Church and State erected by the first amendment."[6]

Defendants filed their third motion for summary judgment on February 23, 1995, asserting that the trial court lacked subject-matter jurisdiction to hear Brazauskas' defamation claim on First Amendment grounds; they argued that an examination of defendants' alleged defamatory statements would "require[ ] an evaluation of [Brazauskas'] action in an ecclesiastical light and [could not] be examined without ... reference to church teachings and governance." Defendants also asserted that the statements were protected by a qualified privilege of common interest; that they did not harm Brazauskas' reputation or deter third persons "from dealing or associating with her"; and that she had consented to their publication.

Brazauskas filed a brief in opposition to defendants' third motion for summary judgment on October 6, 1995. She argued that defendants did not have an absolute privilege under the First Amendment to defame her, and that their freedom for religious action "remain[ed] subject to regulation for the protection of society." Brazauskas also attacked defendants' assertions of qualified privilege

---

**5.** The First Amendment to the United States Constitution reads in relevant part as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

**6.** Brazauskas filed a "motion to vacate and/or set aside" the trial court's order granting defendants' first motion for summary judgment on July 31, 1995; the chronological case summary

notes that this motion was denied on October 31, 1995. She also filed a "motion to vacate and/or set aside" the trial court's order "to conform with [a] recent Indiana Court of Appeals decision" on May 1, 1997, which was denied by the trial court on December 5, 1997. The decision to which Brazauskas referred is *Konkle v. Henson*, 672 N.E.2d 450 (Ind.Ct.App.1996).

and of her consent to the publication of the alleged defamatory statements. The trial court granted defendants' third motion for summary judgment without comment on December 5, 1997.

On October 15, 1996, Brazauskas amended her complaint for fraud, constructive fraud, and equitable estoppel. With respect to her fraud claim, she asserted that the diocese had knowingly and intentionally misrepresented her employment contract as binding and enforceable in civil court, and that she had detrimentally relied on this misrepresentation. As to the constructive fraud claim, she maintained that defendants "stood in a special confidential and fiduciary relationship" with her as a member of the parish in the diocese "and by virtue of the special and confidential relationship" between her and Simmons, Bishop John D'Arcy, and other diocesan officials. She claimed that these special relationships, in conjunction with their alleged fraudulent actions, constituted constructive fraud. Brazauskas also asserted that she had relied on defendants' acts of alleged fraud and constructive fraud with respect to her employment contract, and that defendants were therefore estopped from denying the enforceability of the contract.

Defendants filed their answer to Brazauskas' amended complaint on October 24, 1996, denying her allegations and raising seven affirmative defenses. They filed their fourth motion for summary judgment with respect to the fraud, constructive fraud, and equitable estoppel claims on May 2, 1997. Defendants asserted that the trial court lacked subject-matter jurisdiction to hear these claims because of First Amendment constraints. They also argued that her fraud claims were barred by the statute of limitations; that Brazauskas could not prove all the elements of either a fraud of constructive fraud claim; and that she could not establish a claim of equitable estoppel. The trial court granted defendant's fourth motion for summary judgment without comment on December 5, 1997.

On March 20, 1998, Brazauskas filed a renewed motion for the trial court's entry of final judgment as to its orders granting defendants' first, third, and fourth motions for summary judgment pursuant to T.R. 54(B).[7] The trial court granted this motion on April 23, 1998. Brazauskas then filed a praecipe to initiate this appeal.

## Discussion and Decision
### Standard of Review

A trial court's ruling on a motion for summary judgment comes before this Court clothed with a presumption of validity. *Harvest Life Ins. Co. v. Getche,* 701 N.E.2d 871, 874 (Ind.Ct.App.1998), *trans. denied* (1999). As the party appealing the grant of summary judgment, Brazauskas bears the burden of persuading us that the trial court erred. *Id.* "When reviewing a grant of summary judgment, we use the same standard as applied by the trial court." *Id.* "Summary judgment should be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.;* Ind. Trial Rule 56(C).

We consider the designated evidence in a light most favorable to the non-moving party, and we resolve any doubt about a fact or inference in her favor. *Id.* Summary judgment is inappropriate where material facts conflict, or where undisputed facts lead to conflicting material inferences. *Id.* This Court may not reverse a grant of summary judgment "on the ground that there is a genuine issue of material fact unless material facts and relevant evidence were specifically designated to the trial court." *Brunner v. Trustees of Purdue University,* 702 N.E.2d 759, 760 (Ind.Ct.App. 1998); Ind. Trial Rule 56(H). "Summary judgment should not be used as an abbreviated trial." *Id.*

### I. Defendants' First Motion for Summary Judgment: Breach of Contract

In granting defendants' first motion for summary judgment for lack of subject-

---

7. *See also* Ind. Trial Rule 56(C), which provides in relevant part:

A summary judgment upon less than all the issues involved in a claim or with respect to less than all the claims or parties shall be

interlocutory unless the court in writing expressly determines that there is not just reason for delay and in writing expressly directs entry of judgment as to less than all the issues, claims or parties.

matter jurisdiction, the trial court drafted a three-page memorandum that outlines the reasoning behind its decision. We may not rely on any findings of fact and conclusions of law entered by a trial court on a motion for summary judgment, but must instead base our decision on the materials properly presented to the trial court. *Harvest Life Ins. Co.*, 701 N.E.2d at 874. Consequently, we "will affirm a grant of summary judgment if it is sustainable on any theory or basis found in the record." *Id.*

■■■ What the trial court neglected to consider, however, and what neither party mentions on appeal, is that an attack on the court's subject-matter jurisdiction cannot form the basis of a motion for summary judgment.[8] *Albright v. Pyle*, 637 N.E.2d 1360, 1362 (Ind.Ct.App.1994); *Perry v. Stitzer Buick*, 637 N.E.2d 1282, 1286 (Ind.1994). A claim of lack of subject-matter jurisdiction should be pursued through a motion to dismiss under Ind. Trial Rule 12(B)(1). *Albright*, 637 N.E.2d at 1363. There are several important substantive distinctions between motions for summary judgment and motions to dismiss for lack of subject-matter jurisdiction:

> A summary judgment is a decision on the merits which merges or bars the action for res judicata purposes and which may not be rendered by a court that itself lacks subject matter jurisdiction[.] ...[9]
>
> Dismissals under [T.R. 12(B)(1)] serve simply to hold a matter in abatement such that the plaintiffs may still avail themselves of any existing administrative remedies[.]

*Id.* "When a court lacks subject matter jurisdiction, any action it takes is void." *Perry*, 637 N.E.2d at 1286. The lack of subject-matter jurisdiction can be raised at any time, and either the trial court or the Court of Appeals is required to consider the issue *sua sponte* if it is not questioned by the parties. *Albright*, 637 N.E.2d at 1363. We will therefore treat defendants' first motion for sum-

mary judgment as a motion to dismiss for lack of subject-matter jurisdiction under T.R. 12(B)(1). *See Walters v. Modern Aluminum*, 699 N.E.2d 671, 673 (Ind.Ct.App.1998), *trans. denied* (worker's compensation case).

■■■ In *Perry*, our supreme court reiterated the procedural guidelines for a trial court in considering a motion to dismiss under T.R. 12(B)(1):

> In ruling on a motion to dismiss for lack of subject matter jurisdiction, the court may resolve factual disputes[.] The court has considerable latitude in devising procedures to ferret out the facts pertinent to jurisdiction, and it is well established that in doing so it may consider not only the complaint and motion but any affidavits or other evidence submitted[.] Moreover, when considering a motion to dismiss for want of subject matter jurisdiction, a court may weigh the evidence to determine the existence of the requisite jurisdictional facts[.]

637 N.E.2d at 1286–1287. This Court will affirm the trial court's judgment "on any theory supported by the evidence of record." *Walters*, 699 N.E.2d at 673.

It is worth noting that Indiana appellate courts have decided relatively few cases regarding a trial court's ability to adjudicate employment-related disputes involving religious organizations; it is therefore not surprising that both parties rely heavily on decisions from other state tribunals and from the federal bench. Before we may engage in a First Amendment analysis of Brazauskas' breach of contract claim, however, we must confirm the presence of its three essential elements: "the existence of a contract, the defendant's breach thereof, and damages." *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind.Ct.App.1998).

■■■ Ind. Trial Rule 9.2(A) reads as follows: "When any pleading allowed by these rules is founded on a written instrument, the original, or a copy thereof, must be included

---

8. In her memorandum opposing defendant's summary judgment motion, Brazauskas questioned this procedural error in passing but did not attack it with any supporting authority. We also note that defendants raised the issue of subject-matter jurisdiction as an affirmative defense to Brazauskas' amended complaint.

9. Omitted citations are hereinafter indicated by "[.]" for legibility purposes.

in or filed with the pleading. Such instrument, whether copied in the pleadings or not, shall be taken as part of the record." In her amended complaint, Brazauskas alleges the existence of the 1990 contract and insinuates that Martelli removed it from her desk before he fired her; in their answer to the amended complaint, defendants deny that the contract ever existed. Whatever the reason, the fact remains that the 1990 contract was not filed with Brazauskas' complaint and is not a part of the record before this Court. Ind. Trial Rule 9.2(F) gives a trial court discretion to order a party to attach an instrument to its pleading if it has not already done so; however, it is obvious that compliance with T.R. 9.2 would be impossible in this case. *See Ahnert v. Wildman,* 176 Ind.App. 630, 639, 376 N.E.2d 1182, 1188 (1978) (appeal from summary judgment; plaintiff's breach of contract claim "without substance as there is no such contract in the record" or attached to the complaint as required by T.R. 9.2(A)); *cf. Wilson v. Palmer,* 452 N.E.2d 426, 430 (Ind.Ct.App.1983) (trial court erred in failing to comply with T.R. 9.2(F); court should have ordered plaintiff to attach instrument to complaint or held a hearing to dismiss pursuant to Ind. Trial Rule 41(E) instead of summarily dismissing claim).

In summary, we hold that the trial court erred in granting summary judgment in favor of defendants on Brazauskas' breach of contract claim; instead, it should have treat-

**10.** T.R. 41(E) provides in relevant part:

> Whenever there has been a failure to comply with these rules or when no action has been taken in a civil case for a period of sixty [60] days, the court, on motion of a party or on its own motion shall order a hearing for the purpose of dismissing such case. The court shall enter an order of dismissal at plaintiff's costs if the plaintiff shall not show sufficient cause at or before such hearing.

**11.** In her brief, Brazauskas argues that because neither party gave 30 days' notice of intent not to renew the 1987 contract, "the contract simply renewed itself." Not only has she waived consideration of this argument by raising it for the first time on appeal, but the 1987 contract also states that "[u]pon completion of the contract period a new contract will be signed." *See Evans v. Tuttle by Tuttle,* 645 N.E.2d 1119, 1121 (Ind.Ct.App.1995) (party may not raise issue for first time on appeal); *see also Mehling v. Dubois County Farm Bureau Co-op. Ass'n, Inc.,* 601

ed defendants' motion for summary judgment as a motion to dismiss for lack of subject-matter jurisdiction under T.R. 12(B)(1). Regardless of this procedural error, because Brazauskas has failed to produce the employment contract upon which she bases her claim, the trial court is ordered to vacate its order of summary judgment and hold a hearing pursuant to Ind. Trial Rule 41(E)[10] in contemplation of dismissal of the claim.[11] *See Rumfelt v. Himes,* 438 N.E.2d 980, 983–984 (Ind.1982) (necessity of holding a hearing before dismissal); *see also Chesterfield Management, Inc. v. Cook,* 655 N.E.2d 98, 101 (Ind.Ct.App.1995), *trans. denied* (1996) (documents outside the record cannot be considered by this Court on appeal or used by party to support its arguments). Consequently, we need not address the parties' arguments on this issue regarding the First Amendment and subject-matter jurisdiction.

## II.  Defendants' Third Motion for Summary Judgment: Defamation

◼ Defendants' initial argument in their third motion for summary judgment concerned the trial court's lack of subject-matter jurisdiction to hear Brazauskas' defamation claim under the First Amendment. We have observed that the proper procedural vehicle for claiming lack of subject-matter jurisdic-

N.E.2d 5, 6 (Ind.Ct.App.1992) (contracts that cannot be performed within one year must be in writing and signed by party to be charged to be enforceable under Statute of Frauds [IND.CODE § 32–2–1–1]). The 1986 contract contains a similar "notice of non-renewal" provision; however, there are many substantive differences between the 1986 contract and the 1987 contract, including job title/description, salary, and contract duration. Without having the alleged 1990 contract in the record before us, we may not consider the merits of Brazauskas' breach of contract claim. We also note that merely by assuming that the 1990 contract existed for purposes of summary judgment, defendants cannot be said to have acknowledged its existence for all other purposes. Finally, we note that with respect to defendants' first motion for summary judgment, Brazauskas appealed only on her breach of contract claim and did not appeal on her claims for fraud, promissory estoppel, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress.

tion is a motion to dismiss under T.R. 12(B)(1). *See Albright,* 637 N.E.2d at 1363. Defendants also argued that the alleged defamatory statements were protected by a qualified privilege of common interest; that these statements did not harm Brazauskas' reputation or "deter third persons from dealing or associating with her"; and that she had consented to the publication of these statements.

According to the 1987 contract, some of Brazauskas' responsibilities as P.A. included sharing responsibility for staff development; exercising "responsibility for the spiritual development of the specific components of [the] faith community, e.g., faith development, teen formation, liturgy and worship, and the like"; assuming a "public role in the leadership of prayer in various parish celebrations and functions"; and assuming responsibility for "various types of sacramental programs," "[t]he training and function of liturgical ministers," and "[t]he catechumenate and Rite of Christian Initiation of Adults." Regardless of whether she may be considered a member of the Roman Catholic clergy—a question disputed at various points in the record— Brazauskas clearly was responsible for developing, implementing, and supervising various ecclesiastical programs for the parish.

Some of the allegedly defamatory statements Martelli made after he fired Brazauskas include the following: that she "cannot be trusted with seven-year-old children";[12] that the reasons for her termination were "personal and confidential"; and that she was "incapable of Christian ministry" and had a "vindictive heart." In an interview with a reporter for the *National Catholic Reporter,* diocese Vicar–General Monsignor James Lester ("Lester") mentioned that he did not think Brazauskas had a "leg to stand on"; when asked about the specific nature of the defendant's case against her, Lester replied, "What else can I tell you without going into the bad parts? In strict justice, I don't think we have to pay her a penny." While

Brazauskas argues that the First Amendment does not allow church officials to "maliciously set out to destroy a person's reputation," the defendants claim that a trial court is prohibited from delving into the reasons for Brazauskas' termination because it is "an ecclesiastical concern." In their respective briefs, each party advances its interpretation of the allegedly defamatory statements and attempts to show that the statements either do or do not involve questions of religious doctrine that may or may not be considered by a trial court.

In *Konkle v. Henson,* 672 N.E.2d 450, 454– 455 (Ind.Ct.App.1996), which involved a church's alleged negligent hiring and retention of a minister accused of sexual molestation, we began our analysis with a brief examination of First Amendment principles regarding tort claims against religious organizations:

> The First Amendment, applicable to the states through the Fourteenth amendment, contains two freedoms with respect to religion: the freedom to believe and the freedom to act. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The freedom to believe is absolute, while the freedom to act is subject to regulation for the protection of society. *Id.* at 303–04; 60 S.Ct. at 903– 04. . . .
>
> Excessive entanglement [between church and state] occurs when the courts begin to review and interpret a church's constitution, laws, and regulations. *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 709–10, 96 S.Ct. 2372, 2380–81, 49 L.Ed.2d 151 (1976), *reh. denied,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976). The First Amendment prohibits courts from resolving doctrinal disputes or determining whether a religious organization acted in accordance with its canons and bylaws. *Id.* at 713, 96 S.Ct. at 2382. . . . .

**12.** With respect to this statement, perhaps the one most obviously susceptible to a defamatory interpretation, defendants assert that Martelli meant he was unable to trust Brazauskas with the religious education of young children. Without considering the validity of this interpretation,

we merely note that it is at least nominally supported in the depositions of parishioners Susana M. Cahill and Sally M. Vance–Trembath, both of whom were present at the meeting where Martelli made this statement.

The United States Supreme Court has instructed that the First Amendment does not prohibit courts from opening their doors to religious organizations [footnote omitted]. *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969). Instead, a court can apply neutral principles of law to churches without violating the First Amendment. *Id.* The First Amendment only prohibits the court from determining underlying questions of religious doctrine and practice. *Id.*

Applying this analysis to tort claims against religious organizations, several courts have determined that when purely secular conduct is at issue, courts can apply secular standards and hold churches responsible for the effects of their conduct on third parties.

It is important to note that the "neutral principles of law" approach as enunciated in *Presbyterian Church* and further developed in *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) has been applied only to disputes involving church property, although the United States Supreme Court noted in *Serbian* that the necessity of deciding church disputes without inquiring into doctrinal issues "applies with equal force to church disputes over church polity and church administration." 426 U.S. at 710, 96 S.Ct. at 2381, 49 L.Ed.2d at 163. In *Konkle*, we held that the defendant's alleged acts of sexual molestation "were not religiously motivated," and that the court was "simply applying secular standards to secular conduct which is permissible under First Amendment standards." 672 N.E.2d at 456.

■ In the instant case, Brazauskas argues that defendants' alleged statements constitute a "defamation of character, pure and simple, to be decided by 'neutral principles of law' "; conversely, defendants claim that the "First Amendment prevents civil courts from exercising jurisdiction over claims related to the employment of church employees whose duties are primarily religious." We note that the initial determination of whether a communication is defamatory is a question of law for the trial court, and that the communication must be viewed "in context and given its plain and natural meaning, 'according to the idea [it is] calculated to convey to whom [it is] addressed.' " *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind.Ct.App. 1992), *trans. denied*, quoting *Jacobs v. City of Columbus*, 454 N.E.2d 1253, 1264 (Ind.Ct. App.1983). "Moreover, the allegedly defamatory words are to be construed in light of the circumstances of their utterance." *Rambo*, 587 N.E.2d at 145.

In conducting the above analysis, however, the trial court in the instant case would be engaging in an impermissible scrutiny of religious doctrine. We find the following analysis from the Court of Special Appeals of Maryland to be persuasive:

> When the conduct complained of occurs in the context of, or is germane to, a dispute over the plaintiff's fitness or suitability to enter into or remain a part of the clergy, however, it is difficult to see how the forbidden inquiry could be avoided. Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church.

*Downs v. Roman Catholic Archbishop of Baltimore*, 111 Md.App. 616, 624, 683 A.2d 808, 812 (1996) (former candidate for priesthood brought defamation suit against members of church hierarchy).

■ Both society and the state have rightfully conferred significant importance on the protection of an individual's personal and professional reputation, even to the point of restricting the rights of others to communicate freely in this regard. However, when officials of a religious organization state their reasons for terminating a pastoral employee in ostensibly ecclesiastical terms, the First Amendment effectively prohibits civil tribunals from reviewing these reasons to determine whether the statements are either defamatory or capable of a religious interpretation related to the employee's performance of her duties. Brazauskas characterizes defendants' reasons

for terminating her employment and their explanations for their subsequent statements as post hoc rationalizations, calculated to grant them sanctuary from civil inquiry into the allegedly harmful effects of their words and actions. Regardless of the validity of this assertion, the First Amendment prevents this Court from scrutinizing the possible interpretations of defendants' statements and their purported reasons for uttering them; to conclude otherwise would effectively thrust this Court into the forbidden role of arbiter of a strictly ecclesiastical dispute over the suitability of a pastoral employee to perform her designated responsibilities.

In conclusion, the trial court erred in granting defendants' third motion for summary judgment because it never had subject-matter jurisdiction to decide Brazauskas' defamation claim. The trial court is therefore ordered to vacate its motion for summary judgment and to dismiss the defamation claim.[13]

### III. Defendants' Fourth Motion for Summary Judgment

■ In their fourth motion for summary judgment, defendants asserted that the trial court did not have subject-matter jurisdiction to decide Brazauskas' claims for fraud, constructive fraud, and equitable estoppel. As stated above, defendants should have challenged the trial court's subject-matter jurisdiction through a motion to dismiss under T.R. 12(B)(1). *See Albright,* 637 N.E.2d at 1363. Defendants also attacked these claims on substantive grounds, and the trial court granted the summary judgment motion without comment. However, we need not address the merits of Brazauskas' arguments on appeal because her fraud and estoppel claims are inextricably linked to her breach of contract claim. Because we have held that the breach of contract claim must fail, the fraud and estoppel claims likewise cannot succeed.

■ "To sustain an action for fraud, the plaintiff must prove that the defendant made a material misrepresentation of a past or existing fact, which was false, was made with

knowledge or in reckless ignorance of the falsity," was relied upon by the plaintiff, and proximately caused the plaintiff's injury. *First Bank of Whiting v. Schuyler,* 692 N.E.2d 1370, 1372 (Ind.Ct.App.1998), *trans. denied.* Brazauskas' fraud claim was based upon the defendants' "knowing and intentional misrepresentation" of the enforceability of her written employment contract; without proof that the contract at issue ever existed, we may not inquire into defendants' alleged misrepresentations or Brazauskas' reliance on them.

■ The essential elements of constructive fraud are (1) a duty existing because of the relationship between the parties; (2) "representations or omissions made in violation of that duty"; (3) "reliance thereon by the complaining party"; (4) "injury to the complaining party as a proximate result thereof"; and (5) the gaining of an advantage by the defendant at the expense of the plaintiff. *Wells v. Stone City Bank,* 691 N.E.2d 1246, 1250–1251 (Ind.Ct.App.1998), *trans. denied.* Again, the defendants' representations of which Brazauskas complains relate to the enforceability of her employment contract.

■ To support a claim for equitable estoppel, a plaintiff must prove "(1) a representation or concealment of a material fact, (2) made by a person with knowledge of the fact and with the intention that the other party act upon it, (3) to a party ignorant of the fact, (4) which induces the other party to rely or act upon it to his detriment." *Wabash Grain, Inc. v. Smith,* 700 N.E.2d 234, 237 (Ind.Ct.App.1998). Here, as above, the representation relates to the enforceability of Brazauskas' employment contract.

Because there are no genuine issues of material fact with respect to at least one essential element of each of Brazauskas' claims of fraud, constructive fraud, and equitable estoppel, we affirm the trial court's grant of defendant's fourth motion for summary judgment. *See Colen v. Pride Vending Service,* 654 N.E.2d 1159, 1162 (Ind.Ct.App. 1995), *trans. denied* (1996) ("a defendant is

---

**13.** T.R. 41(B) reads in relevant part: "[A]ny dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, operates as an adjudication upon the merits."

entitled to judgment as matter of law when undisputed material facts negate at least one element of plaintiff's claim"); *Harvest Life Ins. Co.*, 701 N.E.2d at 875 (grant of summary judgment may be affirmed "if it is sustainable on any theory or basis found in the record").

### Conclusion

The trial court's orders for summary judgment are vacated with respect to defendants' first and third motions and affirmed with respect to their fourth motion, and this case is remanded for further proceedings consistent with the instructions contained in this opinion.

Affirmed in part, vacated in part, and remanded with instructions.

STATON and RILEY, JJ., concur.