**STATE of Missouri ex rel., John R. GAYDOS, Bishop of the Diocese of Jefferson City, Father Jerry Kaimann, and Sister Ann Marie Bonvie, Relators,**

v.

**Channing D. BLAEUER, Special Judge, Circuit Court of Howard County, Missouri, Respondent.**

**No. WD 60120.**

Missouri Court of Appeals,
Western District.

Submitted Oct. 25, 2001.

Decided May 21, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 2, 2002.

Application for Transfer Denied
Aug. 27, 2002.

Tom Pirmantgen, Douglas W. Robinson, Michael G. Berry, for appellant.

Kristin Margit Perry, for respondent.

Before PATRICIA BRECKENRIDGE, HAROLD L. LOWENSTEIN, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

The relators in this prohibition proceeding are a bishop, a parish priest, and a nun within the Jefferson City diocese of the Roman Catholic Church. The underlying defamation action arises out of a decision by the relators to not renew the employment contract of the plaintiff Diane Witthaus as principal of the elementary school at Immaculate Conception Catholic Parish in Montgomery City, Missouri. At the time in question, Father Jerry Kaimann was the pastor of the church. Sister Bonvie was the superintendent of schools. Bishop Gaydos was the bishop for the diocese of Jefferson City.

Although there are factual disputes between the parties, we focus only on the facts which are not disputed, and provide them here by way of background as an aid to understanding the petition in this case, which is the operative part of the record as to the jurisdictional issue.

From July 15, 1987, until February 14, 1992, Father Ed Doyle served as the pastor of the Immaculate Conception Church and was responsible for overseeing the activities at the school. Father Doyle hired Diane Witthaus as principal of the school in 1991. In 1992, the bishop transferred Father Doyle to another community. Father Doyle refused to accept the assignment and instead remained in Montgomery City. Father Doyle had no assigned duties in Montgomery City. The bishop chose Father Jerry Kaimann to replace Father Doyle as pastor of the parish in 1992.

In February 1993, Mr. and Mrs. Witthaus, who were friends of Father Doyle, purchased the house owned by Father Doyle, and Father Doyle began residing in the basement apartment of the Witthaus residence. Several parish members objected to Father Doyle living in town after he had been reassigned and had rejected his reassignment. Some parents informed Father Kaimann that they would not send their children to the school because of perceptions regarding Father Doyle's involvement in the school administration.

In November 1997, the chairperson of a charity auction for the church, Polly Sachs, brought up to Mrs. Witthaus the matter of the friendship between Mr. and Mrs. Witthaus and Father Doyle. Ms. Sachs expressed the view that she and others in the community perceived it to be improper for Father Doyle to live in the home of Mr. and Mrs. Witthaus. Mrs. Witthaus related these statements to Sister Ann Marie Bonvie. Ms. Sachs also contacted Sister Bonvie and Father Kaimann about her intention to remove her children from school because of her views on the friendship with Father Doyle. On November 11, 1997, Witthaus met with Father Kaimann. According to Witthaus, Kaimann told Witthaus that he wished for her to resign.

At the school board meeting on January 21, 1998, there were discussions among the board members about an alleged perception in the parish that Father Doyle was influencing Witthaus in connection with the administration of the school. After discussion, the board decided to recommend non-renewal of Witthaus' contract for the upcoming school year. After hear-

ing the recommendation, Father Kaimann decided not to renew the contract of Witthaus for the coming school year. Thereafter, Witthaus appealed the non-renewal through the grievance procedures available within the Catholic church's educational system by obtaining review in two formal hearings called a Level II review and a Level III review, respectively. The hearings were conducted by church hearing officers, and both sides presented evidence. One of the items discussed at the hearing was raised by Witthaus' counsel, who asserted that Witthaus' good reputation was at stake, and that her reputation may have been tarnished by the relators "creating an environment of suspicion about her relationship with Father Ed Doyle." After hearing the evidence and considering the issues, the diocese affirmed Father Kaimann's decision not to renew Witthaus contract.

### The Petition

Following the conclusion of the grievance procedure, Mrs. Witthaus brought an action for damages against Father Kaimann, Sister Bonvie, Bishop Gaydos, and the diocese. In her petition, she set forth claims for defamation. In her prayer, she states she seeks damages for present loss of her employment, for the future loss of employment, loss of reputation, for medical expenses, and pain and suffering caused by emotional distress induced by the actions of defendants, together with punitive damages. The petition states that at all times the individual defendants were acting in their official capacities as agents of the diocese of Jefferson City. The petition alleges that Defendant Kaimann on various occasions stated to other persons that "he had been told" there was a sexual affair going on between Father Ed Doyle and Plaintiff Witthaus. It also alleges that on various occasions Defendant Kaimann stated to other persons that Diane Witthaus

"had been influenced in her job performance by Father Ed Doyle and that influence would cause plaintiff to be dismissed from her job." The petition also alleges that on numerous occasions Defendant Bonvie stated to other persons that Ms. Witthaus had been influenced in her job performance by Father Ed Doyle and that "such influence would cause her to be dismissed from her job." Plaintiff Witthaus also alleges that on or about November 13, 1997, Defendants Bonvie and Kaimann stated at a meeting that "the community could not break the connection between Father Edward Doyle and Diane Witthaus." The petition asserts that the statements made at that meeting were understood by those present to accuse Ms. Witthaus of adultery. "The petition also asserts that on or about November 24, 1997, defendant Bonvie questioned teachers of the school for information regarding Father Doyle's living arrangement with Plaintiff Witthaus." Plaintiff states that this implied to all present that there was an adulterous arrangement and amounted to an accusation against Plaintiff Witthaus about professional wrongdoing by maintaining contact with Father Doyle after his assignment in Montgomery City had ended. Plaintiff further asserts in her petition that on or about January 21, 1998, Father Kaimann stated to Vicky Stonebarger, a school board member, that he did not know if it were true, but that "he had been told" there was a sexual relationship between Father Doyle and Plaintiff Witthaus. The petition further states that on or about December 19, 1997, and January 1998, Defendant Kaimann stated to other persons that "there is a cloud hanging over the school" and that it had to do with plaintiff's "living situation with Father Ed Doyle and the perceptions that exist, not only among some of our own parishioners, but also among people of the community."

Plaintiff asserts that these statements implied that plaintiff was having a sexual affair with Father Ed Doyle. Plaintiff also alleges that these remarks implied that Mrs. Witthaus had been influenced in her job performance by Father Doyle and that the influence would cause plaintiff not be reissued a contract for her job. Plaintiff also pleads that on May 12, 1999, when Bishop Gaydos knew plaintiff was no longer an employee of the diocese, he published to "a third person" a memo in which plaintiff was accused of "ineffective leadership" and being involved in a "situation" that was "a violation of professional boundaries that is giving public scandal." She asserts that all of the foregoing remarks imputed to plaintiff a lack of fitness to perform her duties, or that she was guilty of misconduct in her calling.

### Application for Writ of Prohibition

After unsuccessfully seeking summary judgment in the trial court on First Amendment and other grounds, Relators filed their application for a writ in this court, contending that they are entitled to a writ of prohibition as to the underlying case because the trial court lacks jurisdiction over claims based on statements allegedly made by the Relators in their official capacities as church officers dealing with official church business. They contend that the Free Exercise Clause of the First Amendment to the United States Constitution prohibits the exercise of jurisdiction by a secular court over these claims because the adjudication of such claims by a secular court necessarily submits the practice of their religion to the judgment of others outside their religion, thus interfering with the free exercise of their religion. We granted a preliminary writ of prohibition based on our jurisdictional concerns arising under the Establishment Clause.

■ Prohibition is available as a remedy to prevent a trial court from exceeding its jurisdiction. *State ex rel. Armstrong v. Kohn,* 850 S.W.2d 86, 89 (Mo. banc 1993). Relators claim that they have a First Amendment religious freedom right to run their organizations without interference from governmental entities, including the courts. This right of religious autonomy, they say, is understood to include the right of religious organizations to be free from governmental interference in personnel matters, including the hiring and firing of the organization's own religious officers. Accordingly, they say, the decision to renew or not renew the contract of the principal of a religious school is generally not subject to review by secular authorities. They argue that the continued exercise of jurisdiction in this defamation case also intrudes upon rights protected by the Free Exercise Clause of the First Amendment. The Relators contend that they are entitled to a writ directing the trial court to dismiss the claims in this case on First Amendment grounds.

The First Amendment, in terse prose, provides two sentinels for the protection of rights of religious autonomy—the Establishment Clause and the Free Exercise Clause: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof...." This language was drafted from a historical background of religious discrimination and persecution. *Everson v. Bd. of Educ.,* 330 U.S. 1, 8–11, 67 S.Ct. 504, 91 L.Ed. 711 (1947). It was the desire for religious liberty, of course, that brought the early settlers from Europe. *Id.* at 8, 67 S.Ct. 504. Early colonists, however, once free to make their own religious establishments, rapidly did so, adopting colonial religious codes which enforced the tenets and practices of the majority religion, whether Congregationalist, Anglican, or Roman Catholic. *Id.* at 8–10, 67 S.Ct. 504. Gradually,

there emerged a movement toward the disestablishment of state religions. *Id.* at 11–12, 67 S.Ct. 504. The movement to keep the executive, legislative, and judicial bodies from enmeshing themselves in religious matters has grown over the years as many states adopted constitutional provisions guaranteeing not only freedom of religious practice but also separation of the institutions of government from the institutions of religion. Richard E. Morgan, *The Supreme Court and Religion,* 30–31 (The Free Press, 1974). In 1947, the First Amendment's religion clauses were federalized when the United States Supreme Court, in *Everson v. Board of Education, supra,* incorporated the Establishment Clause of the First Amendment into the substantive aspect of the Due Process Clause of the Fourteenth Amendment. Since 1947, it has been clear that the Establishment Clause as well as the Free Exercise Clause applies to the states as well as the federal government.

For many years before 1947, however, the courts perceived that the exercise of their jurisdiction could pose a threat to religious autonomy. *See, e.g., Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1871). Although *Watson* was not a constitutional decision, the court, speaking through Justice Miller, clearly sought to keep the civil courts from becoming enmeshed in religious issues:

> In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

\* \* \*

> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Id.* at 727, 728–29, 13 Wall. 679. In keeping with this perspective, the courts have been reluctant to adjudicate disputes involving church matters. *See Carl H. Esbeck, The Establishment Clause as a Structural Restraint on Governmental Power,* 84 Iowa L.Rev. 1, 44–45 (1998).

Some religious disputes clearly require the application of religious precepts and the resolution of religious questions. For example, the adjudication of a defamation suit brought by one church member against another based on an accusation that the plaintiff was a heretic would clearly place the court in a position of deciding issues of religious orthodoxy. The courts have found ways to avoid adjudicating religious matters, even when ruling on grounds other than the applicability of the First Amendment. *See, e.g., Creekmore v. Runnels*, 359 Mo. 1020, 224 S.W.2d 1007 (1949) (court held it was not libelous *per se* to charge a clergyman with heresy; petition lacking allegation of special damages held not to state a claim). Thus, courts would intervene in intrachurch disputes only where necessary because the dispute involved legal issues in which the state had a necessary interest, such as title to church property. *Morgan, supra*, at 32–34. *See Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). Even then, the courts would apply neutral principles to avoid taking sides on issues of religious doctrine or practice. *Id.; Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

■ It is clear that the First Amendment does not preclude court intervention in disputes between co-religionists when the issue is *purely* one of whether a religiously neutral civil law—such as a civil action for damages for battery—is presented. *Gibson v. Brewer*, 952 S.W.2d 239, 246–47 (Mo. banc 1997); *Weaver v. African Methodist Episcopal Church, Inc.*, 54 S.W.3d 575, 581 (Mo.App.2001). The mere status of an individual as an officer of a religious entity does not insulate the individual from all liability for tortious conduct. *Weaver*, 54 S.W.3d 575. Also, the courts have exercised jurisdiction over claims asserting *intentional* torts against religious organizations where it was alleged that the organization knew that serious damage would be inflicted on others through the actions of the miscreant clergy member. *Gibson*, 952 S.W.2d at 248.

■ Despite these exceptions, the First Amendment still stands as a limitation on civil court jurisdiction over disputes which are either essentially religious in nature or are sufficiently intertwined with church polity as to constitute a threat of entanglement with religious doctrine or practice. *Milivojevich*, 426 U.S. at 710–12, 96 S.Ct. 2372. Within five years after *Everson*, the U.S. Supreme Court applied the First Amendment to a New York statute that transferred control of Russian Orthodox churches in New York from their Russian governing authority to an organization of such churches in the U.S. The court in that case held that the statute violated the First Amendment because it allowed state intervention into a matter of church governance. *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 110, 73 S.Ct. 143, 97 L.Ed. 120 (1952). Some twenty-five years later, the U.S. Supreme Court handed down what has been regarded as the leading decision dealing with limitations on court jurisdiction of religious disputes. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). In that case, the court decided that civil courts had no jurisdiction to decide claims brought by a defrocked bishop against his denomination relating to a reorganization of his diocese and his removal from office. The Illinois Supreme Court, although recognizing that the matter was a dispute involving issues of church governance, decided in favor of the defrocked bishop because it appeared to the court that the church had exercised its own procedures in an arbitrary manner. On ap-

peal, the U.S. Supreme Court reversed the Illinois Supreme Court, holding that the courts cannot intervene, arbitrariness notwithstanding, because there is no jurisdiction under the constitution. Echoing *Watson v. Jones, supra,* the court declared that civil courts "are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law." *Id.* at 713, 13 Wall. 679. The court, holding that civil probing into such church matters may prove too entangling, also noted that secular notions of "fundamental fairness" cannot be borrowed from civil law and impressed upon internal church governance without violating the First Amendment. *Id.* at 714–15, 13 Wall. 679.

■ In these cases, the court declared that civil courts are forbidden to exercise jurisdiction over issues that require interference in the affairs of religious associations, including matters of doctrine, discipline, ordination and removal of personnel, and religious practice and polity. *See Gibson,* 952 S.W.2d at 246–47. Courts may, however, exercise jurisdiction in disputes having no issues of religious doctrine, policy and practice so long as courts utilize a neutral-principles-of-law approach and judges do not become entangled in questions which are essentially religious. *Jones v. Wolf,* 443 U.S. 595, 604, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); *See Gibson,* 952 S.W.2d at 246 (mentioning, as examples, that a church may be liable for the negligent operation of a motor vehicle, or for negligence in the maintenance of property as to a person who has slipped and fallen on church premises).

The Missouri Supreme Court has grappled with jurisdictional issues under the Establishment Clause in the context of claims of failure to supervise clergy. In *Gibson,* an action was brought by a boy

and his parents for claims arising out of a Catholic priest's alleged sexual misconduct. The court in that case held, *inter alia,* that the religion clauses of the First Amendment preclude adjudication by a civil court of a claim of negligent hiring, ordination and retention of a priest, negligent failure to supervise the priest, and negligent infliction of emotional distress. Citing cases involving the Establishment Clause (*e.g. Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976)) as well as cases involving the Free Exercise Clause, the court held it had no power over the claims for negligent failure to supervise because the adjudication of such claims would create undue entanglement by the court with issues of church practice in personnel matters. At the same time, the court held that tort claims for *intentional* failure to supervise clergy and *intentional* infliction of emotional distress may be adjudicated by civil courts without offending their religion clauses of the First Amendment. *See also Gray v. Ward,* 950 S.W.2d 232 (Mo. banc 1997) (reaching the same result in another case involving the alleged sexual misconduct of a priest).

### Defamation Actions

As for claims of defamation such as are asserted in the case before us, the courts traditionally have protected religious entities on grounds of qualified privilege or other technical aspects of libel law, because generally the litigants did not raise jurisdictional issues based on the religion clauses of the First Amendment. *See e.g., Creekmore v. Runnels; Slocinski v. Radwan,* 83 N.H. 501, 144 A. 787 (1929). *See also* Annotation, Libel and Slander; Privilege as to Communication Respecting Church Matters, 83 N.H. 501, 144 A. 787, 63 ALR 643, 650 (1929). The courts have

consistently protected allegedly defamatory statements made by church officers in connection with disciplinary actions on grounds of qualified privilege. *E.g., Patmont v. Int'l Christian Missionary Ass'n,* 142 Minn. 147, 171 N.W. 302 (1919); *Redgate v. Roush,* 61 Kan. 480, 59 P. 1050 (1900). Recently, courts have acknowledged the jurisdictional limitations under the First Amendment of defamation actions involving clergy, even when purporting to decide cases on grounds of qualified privilege. For instance, in *Joiner v. Weeks,* 383 So.2d 101 (La.Ct.App.1980), a minister was removed from "ministerial fellowship" for fiscal transactions involving a member of the church and related misbehavior. Reverend Joiner pursued the denominational board responsible for the decision to "disfellowship" him, alleging, among other things, defamation for calling him a "con man" and "crooked." The dismissal of Joiner's complaint was upheld. The court held that the statements made in connection with the discipline, including the publication of the resolution of disfellowship, were privileged. *Id.* at 105–06. The court also noted that the defamation claim was in reality an attempt by plaintiff to challenge the decision of the board that he was spiritually unfit to continue as a minister. The court stated:

> The United States Supreme Court has declared it is impermissible, as a violation of the First Amendment of the United States Constitution for civil courts to investigate the propriety of ecclesiastical proceedings in disciplinary matters [citing *Milivojevich*].... To allow defamation suits to be litigated to the fullest extent against members of a religious board who are merely discharging the duty which has been entrusted to them by their church could have a potentially chilling effect on the performance of these duties and could

very well inhibit the free communication of important ideas and candid opinions. *Id.* at 106.

In *Hutchison v. Thomas,* 789 F.2d 392 (6th Cir.), *cert. denied,* (479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986)), a federal court of appeals refused to exercise jurisdiction over the claims of a minister forced by his denomination to retire. Suit was brought against four of his superiors, alleging he was expelled by fraudulent and collusive application of church rules. He pleaded claims in defamation, intentional infliction of emotional distress, and breach of contract. Relying on First Amendment authorities, the court held that the district court had properly dismissed the complaint. The court rejected the minister's contention that the court could resolve the dispute by neutral principles of law. The court noted that the neutral principles approach had been applied only to court property disputes and it should not be extended to religious controversies "in the areas of church government, order and discipline." *Id.* at 396.

Relators also bring to our attention *Brazauskas v. Ft. Wayne–South Bend Diocese, Inc.,* 714 N.E.2d 253 (Ind.Ct.App. 1999). In that case, with facts close to those in the matter at hand, a woman serving a Catholic parish as director of religious education and as a pastoral associate was fired by the parish pastor. She brought claims including defamation, fraud, and breach of contract and intentional infliction of emotional distress. She claimed that the priest had intentionally made misleading and slanderous remarks about her. The allegedly defamatory statements included the following: that she "cannot be trusted with seven-year-old children;" that the reasons for her termination were "personal and confidential;" that she was "incapable of Christian ministry;" and that she had a "vindictive heart."

In an interview with a denominational news reporter concerning her claims, the vicar-general monsignor stated that the plaintiff did not have "a leg to stand on;" that he did not know what else he could say "without going into the bad parts" and that "[i]n strict justice, I don't think we have to pay her a penny." *Id.* at 261.

The defendants in *Brazauskas* filed a series of motions for summary judgment, asserting grounds which included lack of jurisdiction, citing the First Amendment religion clauses. The plaintiff responded to the defendants' motions, arguing that "no doctrinal issue was at stake" that would prevent a court from adjudicating her claims. She said that in reality it was a breach of contract action "together with other causes of actions which civil courts are clearly able to resolve." *Id.* at 257. The trial court, citing both religion clauses of the First Amendment, granted summary judgment to defendants. In considering whether it could constitutionally adjudicate the defamation claims, the court surveyed First Amendment law, and found persuasive the following analysis in *Downs v. Roman Catholic Archbishop of Baltimore,* 111 Md.App. 616, 624, 683 A.2d 808, 812 (1996), which involved a defamation suit brought by a former candidate for the priesthood:

> When the conduct complained of occurs in the context of, or is germane to, a dispute over the plaintiff's fitness or suitability to enter into or remain a part of the clergy, however, it is difficult to see how the forbidden inquiry could be avoided. Questions of truth, falsity, malice and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church.

Like the court in *Downs,* the *Brazauskas* court held that the defamation claims of the plaintiff should have been dismissed for lack of jurisdiction on First Amendment grounds. The court went on to state that when "officials of a religious organization state their reasons for terminating a pastoral employee in ostensibly ecclesiastical terms, the First Amendment effectively prohibits civil tribunals from reviewing those reasons to determine whether the statements are either defamatory or capable of a religious interpretation related to the employee's performance of her duties." 714 N.E.2d at 262. Other cases reaching a similar result as to defamation claims cited by relators are: *Black v. Snyder,* 471 N.W.2d 715, 719–21 (Minn.Ct.App.1991) (Establishment Clause bars defamation claim related to discharge; does not preclude court review of claim of sexual harassment); *Farley v. Wis. Evangelical Lutheran Synod,* 821 F.Supp. 1286, 1290 (D.Minn.1993) (First Amendment bars defamation claim of discharged minister of a mission church); *Yaggie v. Indiana-Kentucky Synod, Evangelical Lutheran Church,* 860 F.Supp. 1194, 1198 (W.D.Ky. 1994), aff'd. 64 F.3d 664 (5th Cir.1995) (First Amendment precluded jurisdiction of defamation claim by minister against parishioners); *Schoenhals v. Mains,* 504 N.W.2d 233, 236 (Minn.Ct.App.1993) (Establishment Clause barred review of defamation claims by members against pastor and church in connection with termination of membership); *Klagsbrun v. Va'ad Harabonim of Greater Monsey,* 53 F.Supp.2d 732, 741 (D.N.J.1999) (Establishment Clause precluded adjudication of libel and slander claims against Orthodox Jewish rabbis by members of an Orthodox community).

In response to Relator's arguments, Respondent cites the Missouri case of *Hester v. Barnett,* 723 S.W.2d 544 (Mo.App.1987). Respondent neither analyses nor discusses

this case, but argues that it supports the court's exercise of jurisdiction in this case. In *Hester,* a minister publicly accused a husband and wife (who were apparently not members of the church, *Id.* at 559) of various criminal acts including arson, theft, and child abuse. This court held that the Free Exercise Clause did not deprive the civil courts of jurisdiction over the defamation claims where allegedly defamatory statements did not amount to expressions of religious belief or religious purpose and were allegedly made as to individuals who were assumed to not be members of the religious body. *Id.* at 559–60.

■ In *Hester,* this court considered only the Free Exercise Clause, because that was the only constitutional provision raised by the litigants. The Free Exercise Clause, however, is not the only provision implicated in suits involving religious disputes. *See Everson,* 330 U.S. at 15, 67 S.Ct. 504 (describing the interrelationship and complementary nature of the religion clauses); Laurence H. Tribe, *American Constitutional Law,* § 14–11, at 1231–42 (2d ed.1988); *Gibson,* 952 S.W.2d at 246-47 (citing Establishment Clause cases and invoking the Establishment Clause test formulated in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), in dealing with the jurisdictional issue). James Madison, the primary draftsman of the First Amendment's language, wrote that the Establishment Clause (which states *"Congress* shall make no law . . .") was intended to deny jurisdiction over religious matters to all three branches of the federal government. *IX The Writings of James Madison 98* (Gaillard Hunt Ed.1910), cited in *Carl H. Esbeck, The Establishment Clause as a Structural Restraint on Governmental Power,* 84 Iowa L.Rev. 1, 43 (1998). The Free Exercise Clause may often, of course, provide a defense to a defamation claim

and thereby raise jurisdictional issues. It is, however, the Establishment Clause, as applied to the states through the Fourteenth Amendment, which operates *directly* as a structural limitation on government power. *Gibson,* 952 S.W.2d at 246–47; *Klagsbrun,* 53 F.Supp.2d 732; *Black,* 471 N.W.2d 715 (although free Exercise Clause did not preclude jurisdiction, Establishment Clause precluded review of defamation claims); *see Esbeck, supra,* at 50–51. Although this court in *Hester* did not consider the Establishment Clause issue, it appears, at least from the face of the petition, that application of the Establishment Clause would have made no difference. The accusations in *Hester* had no relationship to the discipline of a staff member, a church officer, or even a church member. Here, in contrast to the petition in *Hester,* the petition clearly involves statements made in connection with personnel decisions made by church officers as to another church officer in a religious leadership role.

■ Applying the foregoing principles to the allegations of the petition before us in this case, we discern that, as in *Joiner v. Weeks,* to allow the defamation claims to be litigated would be to allow civil court jurisdiction to enter the back door of the religious entity in question and allow judicial probing of procedure and church polity, with an outside fact-finder sitting in judgment on whether the viewpoint, values, politics, and educational practices of the diocese. As stated in *Downs,* "[q]uestions of truth, falsity, malice and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church." *Downs,* 683 A.2d at 812.

The allegedly defamatory statements in question in this case were generally made

in connection with the decisions of the church officials as to the non-renewal of Mrs. Witthaus' contract, and were made by, to, and about people who were part of the religious organization in question. The statements relate to matters within the religious cognizance of the diocese— the degree to which Mrs. Witthaus was able to separate herself from the opinions and influence of an apparently unpopular, disenfranchised priest, and consequently the degree of influence of that priest in school affairs. The parish and the diocese also had an interest in perceptions related to the friendship between the two.

■ That Mrs. Witthaus' purported defamation claims are inextricably intertwined with the non-renewal itself is evident from the prayer of her petition, where she seeks damages for loss of employment, future loss of employment, medical expenses, and pain and suffering, all of which, of course, are related primarily to the non-renewal of her contract and secondarily to reputational damage. The fact that she also pleads loss of reputation is not enough to demonstrate that the alleged defamatory remarks can be separated from the personnel matter. Her claim that the church wrongly declined to renew her contract has been adjudicated already by the religious organization she served. Because she did not obtain satisfaction in that process, she now seeks to have the court system intervene; yet this court is obligated to defer to the Catholic Church's own resolution of these issues. *Milivojevich,* 426 U.S. at 710–712, 96 S.Ct. 2372; *Gibson,* 952 S.W.2d at 247.

This case involves the ability of this church and diocese to operate within its own sphere according to its own methods, without judicial interference. In *Hester,* 723 S.W.2d 544, there was no issue of the ability of the church to define its own mission and select its own officials without interference from secular government.

Nor is this a case like *Weaver v. African Methodist Episcopal Church,* 54 S.W.3d 575 (Mo.App.2001), where the claim against the individual minister for battery was allowed to stand although the claims against the church were not, because the claims against the minister did not involve the ability of the church to define its mission and select its own representatives. Rather, this case, like *Brazauskas,* involves the dismissal of a person in religious leadership for alleged grounds (whether true or false) relating to the appropriateness of the continued employment of that person as a part of the church's religious leadership.

■ In *Gibson,* the Missouri Supreme Court stated that adjudicating the reasonableness of a church's supervision of a cleric "requires inquiry into religious doctrine." 952 S.W.2d at 247. The court also said, noting First Amendment authorities, that this would "create an excessive entanglement, inhibit religion, and result in the endorsement of one model of supervision," reciting the well-known test adopted in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), as an approach to determining whether government action would violate the Establishment Clause. *Id.* In the same way, adjudicating whether the church's stated reasons for terminating the employment of a church officer constitute unprivileged, actionable defamation presents the same difficulties. As a practical matter, it is impossible to separate the defamation from the non-renewal, not only as to the issue of the reasonableness of the statements made, but also as to damages. Perceptions of reasonableness enter into consideration of such concepts as recklessness and malice, leaving the religious entity at the mercy of the perceptions of outsiders, who are likely to be unable to relate to or understand the religious views and practices of the organization. To allow a defamation suit to be litigated in connection

with the termination of a church officer would tend to "have a chilling effect" on the management of the religious entity and the "communication of important ideas and candid opinions." *Joiner*, 383 So.2d at 106.

█ Most of the claims of defamatory remarks herein are related to the non-renewal of the contract, were made during the time of the controversy concerning the non-renewal, and were made to people associated with the church and the school. Taking the petition at face value, the only alleged remark which appears from the face of the petition to have been made outside of the scope of First Amendment protection herein is asserted in paragraph 31 of the Second Amended Petition. In that paragraph, Plaintiff states:

> That on or about May 12, 1999, when Defendant Bishop John Gaydos knew Plaintiff was no longer an employee of the Diocese, Defendant Bishop John Gaydos published to a third person a memo dated November 25, 1997, in which Plaintiff was accused of "ineffective leadership" and being involved in a "situation" that was "a violation of professional boundaries that is giving public scandal."

It appears from the petition that this communication was not connected to the non-renewal issue, but instead came a substantial period of time after the personnel issues were resolved. Witthaus alleges in other paragraphs of the petition that Defendant knew the statements were utterly false, malicious, slanderous, wrongful, intentional, outrageous, and implies that the memo was communicated only for the purpose of harming Witthaus.

Witthaus points out in her brief that the remarks in question were in a memo attached to a letter from Bishop Gaydos to Mr. Bernard Huger, legal counsel for the diocese. Witthaus acknowledges that Relators contend the memo was provided in the context of a letter seeking advice as to the legal ramifications of various issues related to Father Doyle. Witthaus contends, however, the memo was completely unnecessary to the letter and was included only for the purpose of slandering her. While Defendant Gaydos may also have defenses under the First Amendment and the common law, depending on all the facts related to the matter, the face of the petition presents a factual issue that is beyond the scope of our authority in this writ matter involving only issues of jurisdiction.[1] Accordingly, we cannot say as a matter of law that the trial court lacks jurisdiction to proceed further with the adjudication of this claim.

### Conclusion

The writ of prohibition is made absolute as to all claims asserted in Plaintiff's Second Amended Petition except for the claim asserted in paragraph 31, with the general paragraphs related thereto. The trial court is directed to take no action to preside over the other claims of defamation other than to dismiss them for lack of jurisdiction.

BRECKENRIDGE and LOWENSTEIN, JJ., concur.

---

1. The trial court, in resolving factual issues concerning the appropriateness of the inclusion of the memorandum in the letter to Mr. Huger, must consider First Amendment protections related generally to the governance of the diocese (which may be a separate matter from the non-renewal issue itself), and also the defense of common law conditional privilege, as well as any other defenses. It is beyond the scope of our authority in this matter to resolve factual issues related to this allegation.