**Rosalyn WEST, Appellant–Plaintiff,**

v.

**Betty WADLINGTON, Jeanette Larkins, City of Indianapolis d/b/a Indianapolis Metropolitan Police Department, Appellees–Defendants.**

No. 49A02–0809–CV–849.

Court of Appeals of Indiana.

June 10, 2009.

Rehearing Denied Sept. 4, 2009.

Michael D. Head, James Geiger, Matthew Conrad, Geiger Conrad & Head, Indianapolis, IN, Attorneys for Appellant.

Jonathan L. Mayes, Alexander Will, Nicole R. Kelsey, Office of Corporation Counsel, Indianapolis, IN, Attorneys for Appellees.

## OPINION

MATHIAS, Judge.

Rosalynn West ("West"), brought suit in Marion Superior Court against Betty Wadlington ("Wadlington"), Jeanette Larkins ("Larkins"), and Larkins's employer, the City of Indianapolis ("the City") (collectively "the Defendants"), claiming defamation and invasion of privacy. The trial court granted the Defendants' motion to dismiss the complaint. West appeals and claims that the trial court erred in granting the Defendants' motion to dismiss because allowing her to proceed would not require the courts to become "excessively entangled" in church politics and doctrines.[1]

We reverse and remand.

### Facts and Procedural History

At the time relevant to this appeal, West was a member of the Mt. Olive Missionary Baptist Church in Indianapolis ("the Church"). West was the chairman of the Church's Christian Education Committee and a member of the Church's Pastoral Search Committee. Defendants Wadlington and Larkins are also members of the church. Larkins is a member of the Church's "Women of Faith" group. The Church is typically governed by a pastor, but in the absence of a pastor, it is governed by a Board of Deacons and a Board of Trustees. These boards oversee the organization of the Church and decide its religious, doctrinal, and political matters.

On October 15, 2007, Wadlington sent an email to Larkins and two other individuals. This email stated:

> I don't know if you all are aware of the situation that transpired between Sis. Rosalyn West and Minister Felicia Clark, but after I read the letter Minister Clark submitted to the boards describing the situation, and having personally witnessed Sis. West in action on various other occasions—I HAD TO LET THE BOARD KNOW THAT THEY NEED TO DEAL WITH THIS WOMAN NOW!!! Below is my memo to the boards—so if you hear about this situation again—you'll know what's going down. BJW.

Appellant's App. p. 18. Below this text was a copy of a letter that Wadlington had prepared and addressed to the Board of Deacons and Board of Trustees. This letter read:

> I hesitate to write this at first, and then something in my spirit would not

let it rest. I need to reveal this information to you, so that, hopefully, you will make spirit-led decisions in this regard.

The subject of this memo is: Sis. Rosalyn West and your lack of response to the letter written to you by Minister Felicia Clark. It is not just Minister Clark who is concerned about the attitude and spirit being displayed by Sis. West. It may or may not surprise you to know that Sis. West's behavior has been the subject of much discussion among the membership lately, and everyone has the same opinion—SHE NEEDS TO BE DEALT WITH!!!

When Sis. West presented her "case" against former interim pastor, Rev. Wayne T. Harris, Jr., the boards wasted no time in responding and dismissing Pastor Harris. Yet weeks after Minister Clark wrote to you about the way she was treated by Sis. West, nothing has been done. WHY? Do you not believe Minister Clark? If this is the case, let me be among the first to tell you that I have seen and heard Sis. West in action—with her sharp tongue and venomous words towards various members of our church. I have been stupefied by the way she can cut a person to shreds with her tongue. I have witnessed her act as if she thinks nobody on the planet was born with a brain besides her. She values no one's opinion except her own. To say what she said to Minister Clark, is, in a nutshell—INEXCUSABLE!!!

This is a woman who is the head of *Christian* Education and on the Pastoral Search Committee—yet her actions/words have been anything but Christ-like. How can we allow someone to be in charge of educating our body of members when she, herself, needs to be educated on the proper way to talk to and treat people. And how can she be delegated the responsibility of searching for a pastor when nobody will probably meet her personal criteria of perfection?

I used to be on the Christian Education Committee—I respectfully stopped attending the meetings after I witnessed Sis. West *SCREAM* at an elder member of our church who in no way deserved such a level of disrespect. I was dumbfounded! I have seen and heard her interact with various church employees and talk to them as if they are so far beneath her that she doesn't even want to speak to them at all. And if they display the same attitude back to her that she has displayed towards them, they go on her "hit list" of people she needs to "deal with."

Now if anybody is mindless enough not to know that the incident that occurred with Pastor Harris was a set up by Sis. West from the word "GO"—then we are not using the brain that the good Lord gave us. Sis. West made it no secret that she "could not stand" Wayne, Jr. She provoked him in to the behavior he displayed. He just wasn't smart enough to see this coming. She had to know that if she "attacked" his child and wife that he was going to respond—which was exactly what she was hoping for. She accomplished her mission—and the boards helped her—for whatever reason. I think it was a convenient way to "get rid of him" and that she wasn't the only one with this mission.

Remember back in 2003 when I warned you that Pastor Hudson was not the person he appeared to be and that somebody needed to get him "in check" before he destroyed the church? Nothing was done. After all that's transpired with Hudson splitting our church—do you now realize that it was a mistake not to take my warning seriously? Well, I'm warning you again—about Sis. West—she is a one-woman

WRECKING CREW controlled by a spirit that is anything but OF GOD. And you can either do something about her now, or deal with the aftermath of her destruction later—but you will eventually have to deal with it—just like you did with Hudson.

One good thing I did learn under Hudson's leadership—I have the gift of discernment. There is something soooooo wrong with this woman's spirit and she should not be in a leadership role in this church. This is not just my opinion—ask others if you don't believe me. Don't ignore this. Don't think that if you don't deal with it, it will just go away—IT WON'T.

You know me. I've been at Mt. Olive for going on 52 years. I've seen a lot of people come and go and a lot of things change. Removing Sis. West from the chairmanship of the CHRISTIAN Education Committee is a change that needs to be made. Removing her from the pastoral search committee is a change that needs to be made. Wayne, Jr. told her that she had an EVIL spirit-He hit the nail directly on the head!!! She will further destroy this church if you let her remain in a position of leadership because the Holy Spirit is not the spirit that is guiding her thoughts, words and deeds.

You don't need to respond to me and this memo—but you do need to respond to the actions of Sis. West—and do it soon or I believe our church will live to regret it.

Sincerely,

BETTY J. WADLINGTON

Appellant's App. pp. 19–20 (emphases in original).

Larkins, who works for the Indianapolis Metropolitan Police Department, received this email at her work email address, which has the domain of @indygov.org.

Larkins then forwarded this email to eighty-nine other email addresses. Larkins filed an affidavit asserting that all of these addresses "belong to members of or are associated with the Church and the Church's 'Women of Faith'" group. Appellant's App. p. 27.

On February 29, 2008, West filed a complaint alleging defamation and invasion of privacy/false light, naming as defendants Wadlington, Larkins, and Larkins's employer, the City. On April 14, 2008, Wadlington filed a *pro se* answer. On April 21, 2008, Larkins and the City filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Trial Rule 12(B)(1). Attached to the motion to dismiss was Larkins's affidavit. West filed a response to the motion to dismiss on June 16, 2008. On June 27, 2008, the trial court held a hearing on the motion to dismiss. On August 28, 2008, the trial court granted the motion to dismiss. On September 12, 2008, the trial court made a *nunc pro tunc* entry adding Wadlington to the order granting the motion to dismiss. West now appeals.

### I. Standard of Review

This appeal is before us on the trial court's grant of the Defendants' motion to dismiss for lack of subject matter jurisdiction, which they brought pursuant to Indiana Trial Rule 12(B)(1). The parties are generally correct that our review of an appeal from the trial court's decision on a motion to dismiss for lack of subject matter jurisdiction is *de novo*. *See GKN Co. v. Magness*, 744 N.E.2d 397, 400 (Ind.2001) (if facts are not in dispute, or if trial court does not hold evidentiary hearing and instead bases its decision on a paper record, then court on appeal reviews trial court's ruling *de novo*). However, the issue of the appropriate standard of review in the present case is slightly more complex.

In *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.*, 714 N.E.2d 253 (Ind. Ct.App.1999), *trans. denied* ("*Brazauskas I*"), a former pastoral employee of the diocese sued her former employer for, *inter alia*, defamation. The trial court eventually granted the diocese's motion for summary judgment, wherein the diocese had argued that the trial court lacked subject matter jurisdiction to hear these claims because of First Amendment constraints. *Id.* at 257–58. Upon appeal, a panel of this court noted, *sua sponte*, that "the trial court neglected to consider ... that an attack on the court's subject-matter jurisdiction cannot form the basis of a motion for summary judgment." *Id.* at 259 (footnote omitted). Instead, the court wrote, "[a] claim of lack of subject-matter jurisdiction should be pursued through a motion to dismiss under Ind. Trial Rule 12(B)(1)." The *Brazauskas I* court noted the substantive distinctions between motions for summary judgment and motions to dismiss for lack of subject matter jurisdiction:

> A summary judgment is a decision on the merits which merges or bars the action for res judicata purposes and which may not be rendered by a court that itself lacks subject matter jurisdiction[.] Dismissals under [T.R. 12(B)(1)] serve simply to hold a matter in abatement such that the plaintiffs may still avail themselves of any existing administrative remedies[.]

*Id.* (quoting *Albright v. Pyle*, 637 N.E.2d 1360, 1362 (Ind.Ct.App.1994)) (footnote omitted). Therefore, the *Brazauskas I* court treated the defendants' motion for summary judgment as a motion to dismiss for lack of subject-matter jurisdiction, ultimately holding that the trial court did lack subject-matter jurisdiction on the plaintiff's claim of defamation. *Id.* at 260, 263.

Following remand, the matter eventually made its way to our supreme court in *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.*, 796 N.E.2d 286 (Ind.2003) ("*Brazauskas II*"). Before addressing the merits of the case, the court first addressed the "procedural posture" of the case. *Id.* at 289. Following our instructions in *Brazauskas I*, the defendants in *Brazauskas II* argued that, pursuant to Trial Rule 12(B)(1), the trial court lacked subject matter jurisdiction. Our supreme court did not agree with this approach, noting, "Other courts have resolved this procedural question differently." *Id.* Specifically, in *Bryce v. Episcopal Church*, 289 F.3d 648, 654 (10th Cir.2002), the court applied the Federal Rules of Civil Procedure and treated a church's challenge as a motion to dismiss for failure to state a claim under Rule 12(B)(6). The *Bryce* court "found no abuse of discretion by the trial court in considering evidence beyond the pleadings, thereby converting the motion to dismiss into a summary judgment motion, and affirmed the judgment for the church." *Brazauskas II*, 796 N.E.2d at 290 (citing *Bryce*, 289 F.3d at 654, 660); *see also McKelvey v. Pierce*, 173 N.J. 26, 800 A.2d 840, 844 (2002) (treating church defendants' motion to dismiss as motion for judgment on the pleadings that effectively became a summary judgment motion).

The *Brazauskas II* court then explained:

> We agree with the approach taken by [the *Bryce* and *McKelvey*] courts, and hold that the trial court erred in concluding that it lacked jurisdiction over this matter. A court with general authority to hear matters like employment disputes is not ousted of subject matter or personal jurisdiction because the defendant pleads a religious defense. Rather, pleading an affirmative defense like the Free Exercise Clause may un-

der certain facts entitle a party to summary judgment.

We will proceed with our review using the standard applicable to summary judgment, as the trial court did not exclude matters submitted outside the pleadings. *See* Ind. Trial R. 12(B), 56. We will therefore consider whether there is any genuine issue of material fact and whether the Diocese defendants as the moving parties are entitled to judgment as a matter of law. T.R. 56. In doing so, we construe all facts and reasonable inferences in the light most favorable to Brazauskas as the nonmoving party.

796 N.E.2d at 290 (citation omitted).[2]

■ Based upon the explicit holding of *Brazauskas II*, we must conclude that the trial court in the present case did have subject matter jurisdiction. The Marion Superior Court has the general authority to hear matters such as West's claims for defamation and invasion of privacy. *See* Ind.Code § 33–33–49–9 (2004) (providing that the Marion Superior Court has "[c]oncurrent and coextensive jurisdiction with the Marion Circuit Court in all cases and upon all subject matters . . . ."); Ind.Code § 33–28–1–2 (2004) (providing generally that circuit courts have original jurisdiction in "all civil cases and all criminal cases[.]"). The Defendants' "religious defense" does not relieve the trial court of its subject matter jurisdiction. *See Brazauskas II*, 796 N.E.2d at 290.

Instead, the Defendants' affirmative defense based on the First Amendment may be grounds for granting a Trial Rule 12(B)(6) motion, or, if appropriate, a Trial Rule 56(C) motion. *See id.* A Trial Rule 12(B)(6) motion should be treated as a motion for summary judgment if the trial court considers matters outside the pleadings in ruling on the motion. *See* T.R. 12(B); *Azhar v. Town of Fishers*, 744 N.E.2d 947, 950 (Ind.Ct.App.2001).

■ Here, the Defendants did attach an affidavit to their motion to dismiss. And, as in *Brazauskas II*, there is no indication that the trial court excluded matters outside the pleadings. Therefore, as in *Brazauskas II*, the procedural posture of the present case would appear to be one of summary judgment. However, when a Trial Rule 12(B)(6) motion is treated as motion for summary judgment, the court must grant the parties a reasonable opportunity to present summary judgment materials. T.R. 12(B); *Azhar*, 744 N.E.2d at 950. Here, there is no indication that the trial court did, in fact, treat the motion to dismiss as a motion for summary judgment. Instead, the court, and the parties, appeared to treat the motion as one to dismiss for lack of subject matter jurisdiction, contrary to the holding in *Brazauskas II*.[3] Before the trial court could treat the motion as one for summary judgment, the

---

**2.** Although "[m]ost courts agree that the general prohibition on the adjudication of religious questions, once triggered, precludes further adjudication of the issue in question," there is disagreement among courts as to the precise legal operation of the prohibition. *C.L. Westbrook, Jr. v. Penley*, 231 S.W.3d 389, 394 n. 3 (Tex.2007) (citing Scott C. Idleman, *Tort Liability, Religious Entities, and the Decline of Constitutional Protection*, 75 Ind. L.J. 219, 225 (2000)). Some courts treat the question as one of justiciability; some others, such as *Brazauskas II*, treat the matter as an affir-

mative defense to liability, but most courts "broadly conceptualize the prohibition as a subject-matter bar to jurisdiction." *Id.* (collecting cases). Regardless of how other courts treat the issue, we follow the lead of our supreme court.

**3.** This is not surprising, since the parties presented the issue to the trial court as a motion to dismiss for lack of subject matter jurisdiction.

parties should have been afforded the opportunity to present materials on summary judgment.

For this reason alone, we would be justified in reversing the trial court's decision. However, because the parties did treat the Defendants' motion as one to dismiss for lack of subject matter jurisdiction, there was no impediment to the submission of evidence to support their respective positions. West claims that she did not do so because of lack of time to conduct full discovery. The Defendants claim that West had ample time to conduct discovery and still failed to counter Larkins's affidavit which was submitted in support of the Defendants' motion to dismiss. Regardless, even if we considered Larkins's affidavit, the only evidence submitted with regard to the Defendants' motion to dismiss, the Defendants would not prevail.

## II. Excessive Entanglement Defense

■ The Defendants claim that West's claims of defamation and invasion of privacy cannot be addressed by civil courts because to address her claims would require courts to determine questions of religious doctrine. The First Amendment, applicable to the states through the Fourteenth Amendment, contains two freedoms with respect to religion: the freedom to believe and the freedom to act. *Konkle v. Henson,* 672 N.E.2d 450, 454 (Ind.Ct.App. 1996) (citing *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). While the freedom to believe is absolute, the freedom to act is subject to regulation for the protection of society. *Id.* (citing *Cantwell,* 310 U.S at 303–04, 60 S.Ct. 900). However, any such regulation must meet a three-part test: (1) it must have a secular legislative purpose; (2) its principal or primary effect must be one

that neither advances nor inhibits religion; and (3) it must not foster an "excessive government entanglement with religion." *Id.* (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1970)). Our focus here is on part three, excessive government entanglement. Excessive entanglement occurs when courts begin to review and interpret a church's constitution, laws, and regulations. *Id.* (citing *Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 709–10, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976)). The First Amendment prohibits courts from resolving doctrinal disputes or determining whether a religious organization acted in accordance with its canons and bylaws. *Id.* (citing *Milivojevich,* 426 U.S. at 713, 96 S.Ct. 2372).

■ The United States Supreme Court has held that the First Amendment does not prohibit courts from opening their doors to religious organizations. *Id.* at 455 (citing *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)). Instead, a court can apply neutral principles of law to churches without violating the First Amendment. *Id.* The First Amendment only prohibits the court from determining underlying questions of religious doctrine and practice. *Id.*

Here, the bulk of both parties' arguments revolve around the holding of this court in *Brazauskas I.*[4] Thus, further examination of that case is warranted. In *Brazauskas I,* the plaintiff was hired as the director of religious education by the Fort Wayne–South Bend Diocese, Sacred Heart Parish. She signed an employment contract with the parish which provided

---

**4.** Our supreme court's opinion in *Brazauskas II* dealt with the plaintiff's claims for blacklisting and tortious interference with a busi-

ness relationship, not the defamation claim. 796 N.E.2d at 289.

that she would not be discharged without good cause. She later signed another employment contract with the parish as a pastoral associate, which contract was allegedly later renewed for a three-year period. Eventually, a new parish pastor told Brazauskas that she could either resign or be fired from her position. After apparently refusing to resign, Brazauskas was fired.

Brazauskas claimed that the pastor had fired her because "she intimidated him, that they could not get along, and that he did not like working with her." *Brazauskas I*, 714 N.E.2d at 256. The defendants claimed that Brazauskas had been fired because of her "expression of unorthodox theological views and conduct offensive to Church teachings." *Id.* Brazauskas subsequently filed suit against the parish, claiming, *inter alia*, that the pastor had " 'unlawfully, untruthfully, and intentionally made misleading and slanderous remarks' about her and had 'implied that there was something of a bad and sinister nature' about her," causing her injury. *Id.* Specifically, Brazauskas alleged that pastor had said that she had "a vindictive heart," and was "incapable of Christian ministry." *Id.* at 261. The defendants in *Brazauskas I* argued that "an examination of defendant's alleged defamatory statements would 'require[ ] an evaluation of [Brazauskas'] action in an ecclesiastical light and [could not] be examined without . . . reference to church teachings and governance.' " *Id.* at 257. Brazauskas responded that the defendant's alleged statements were simple defamation which could be decided by neutral principles of law.

On appeal, the *Brazauskas I* court first noted that "the 'neutral principles of law' approach . . . has been applied only to disputes involving church property." 714 N.E.2d at 262 (citations omitted). Still, "the United States Supreme Court noted

. . . that the necessity of deciding church disputes without inquiring into doctrinal issues 'applies with equal force to church disputes over church polity and church administration.' " *Brazauskas I*, 714 N.E.2d at 262 (quoting *Milivojevich*, 426 U.S. at 710, 96 S.Ct. 2372). The *Brazauskas I* court concluded that to analyze the plaintiff's defamation claims would require it to "engag[e] in an impermissible scrutiny of religious doctrine." *Id.* at 262. The court quoted with approval the following analysis from the Maryland Court of Special Appeals:

> "When the conduct complained of occurs in the context of, or is germane to, a dispute over the plaintiff's fitness or suitability to enter into or remain a part of the clergy . . . it is difficult to see how the forbidden inquiry could be avoided. Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church."

*Id.* at 262 (quoting *Downs v. Roman Catholic Archbishop of Baltimore*, 111 Md.App. 616, 683 A.2d 808, 812 (Md. Ct. Spec. App. 1996)). The *Brazauskas I* court explained that "when officials of a religious organization state their reasons for terminating a pastoral employee in ostensibly ecclesiastical terms, the First Amendment effectively prohibits civil tribunals from reviewing these reasons to determine whether the statements are either defamatory or capable of a religious interpretation related to the employee's performance of her duties." *Id.* The court rejected the plaintiff's claims that the religious justifications asserted by the defendants for her termination were post-hoc rationalizations:

> Regardless of the validity of these assertions, the First Amendment prevents

this Court from scrutinizing the possible interpretations of defendants' statements and their purported reasons for uttering them; to conclude otherwise would effectively thrust this Court into the forbidden role of arbiter of a strictly ecclesiastical dispute over the suitability of a pastoral employee to perform her designated responsibilities.

*Id.* at 263. The court therefore reversed the trial court's grant of summary judgment to the defendants and instead instructed the trial court to dismiss the defamation claim. *Id.*

We agree with West that *Brazauskas I* is distinguishable from the present case. First, in that case, the alleged defamatory statements were made in the context of the firing of a parish employee by the parish pastor and were related to the fitness of the plaintiff to serve in a pastoral role. Thus, to address Brazauskas' claim would have required the court to intrude into a purely ecclesiastical dispute. Further, the statements in *Brazauskas I* were made by the plaintiff's superior, who was a priest. Here, we are dealing with statements made by one member of the Church about another member.

More importantly, West notes that Larkins forwarded Wadlington's email to several other people using Larkins's work email account. West therefore claims that, unlike the statements made in *Brazauskas I*, Wadlington's letter was sent to people outside the Church's governing bodies. West also notes that Larkins used her work email address, which had a domain of @indygov.org. She therefore claims that it is a "reasonable possibility" that the recipients attributed the contents of this email to her employer, the IMPD and the City of Indianapolis.

The Defendants argue that the fact that Larkins used her work email address to forward Wadlington's email is irrelevant. They note that Larkins's employer, the IMPD, was not mentioned anywhere in the email. Even Larkins's address failed to mention IMPD—it simply contained the domain of @indyg ov.org. Moreover, the Defendants claim that content of the email was obviously about a church matter and was a personal email unrelated to Larkins's employment. The Defendants further insist that Larkins forwarded Wadlington's email only to other Church members. In support of this, they refer to Larkins's affidavit, which does state that "to the best of my knowledge all of the email addresses identified in [the email] belong to members of or are associated with the Church and the Church's 'Woman of Faith.'"[5] Appellant's App. p. 27. Thus, the Defendants claim the current dispute is a purely intra-church political matter, as was the case in *Brazauskas I.*

■ Even if we agree with the Defendants that the Larkins affidavit must be accepted as uncontroverted, it is still not dispositive. The Larkins affidavit states that the email addresses to whom the email was forwarded "belong to members of or are associated with the Church[.]" It does not state that only Church members have access to the email addresses or that only Church members saw the email Larkins forwarded. At this stage in the proceedings, we cannot state with the level of certainty called for in summary judgment proceedings that the statements contained in Wadlington's letter remained a purely intra-church dispute.

■ West further claims that the statements at issue here were not made in

---

**5.** Although West in her reply brief claims that further discovery is required to ascertain the truth of this statement, West did not file any affidavit countering this statement.

strictly ecclesiastical terms, and that her claim of defamation is therefore not purely a religious dispute. The Defendants disagree, directing our attention to those statements in Wadlington's letter that West was "anything but Christ-like" and "controlled by a spirit that is anything but of God." Appellant's App. pp. 16–17. We agree that these statements have religious connotations and cannot form the basis of a defamation claim. For a court to determine the truth or falsity of these claims would require the court to determine questions of religious doctrine and practice, which would constitute excessive entanglement. *See Konkle,* 672 N.E.2d at 455 (citing *Presbyterian Church,* 393 U.S. at 449, 89 S.Ct. 601).

 West does not deny that some of the statements in Wadlington's letter have religious undertones, but claims that the Defendants have ignored other statements in the email which she claims are defamatory in a purely secular sense. We agree with West that several statements in the letter could be viewed as defamatory without requiring a court to determine any religious questions. We first note that the Wadlington letter claims that West "attacked" the former pastor's family. West claims that this could be taken to mean a physical attack, which would be a crime. Although we agree with the Defendants that this statement does not necessarily imply that West physically attacked the former pastor and his family, a trier of fact could reasonably infer such. A communication that imputes criminal conduct is defamation *per se.* *Kelley v. Tanoos,* 865 N.E.2d 593, 596 (Ind.2007). Thus, this statement could be defamatory without any question of religious doctrine or practice.

West also notes that the letter claims she was "a one-woman wrecking crew," which, she claims, is defamatory without any reference to religious doctrine or practice. Again, we agree. This statement, along with the claim that West behaved in a disrespectful manner and screamed at an elderly member of the Church, could be considered defamatory without requiring the court to resolve any religious questions.

 A more difficult question is presented by the claim in Wadlington's letter that West had an "evil spirit." West claims that this could be considered defamatory in a purely secular sense, whereas the Defendants claim that such a determination would constitute excessive entanglement. In support of her argument, West cites *Kliebenstein v. Iowa Conference of United Methodist Church,* 663 N.W.2d 404 (Iowa 2003). In that case, a letter was signed by church officials and mailed to fellow church members and others in the community, and the letter used the phrase "spirit of Satan" to describe the plaintiff. *Id.* at 405. The trial court agreed with the defendants that the phrase "spirit of Satan" was a purely ecclesiastical term, and that the First Amendment prevented a court from adjudicating the impact of this statement in the context of a civil defamation suit. *Id.* at 406. On appeal, the Iowa Supreme Court first noted that the fact that the letter about the plaintiff was published outside the congregation "weaken[ed] th[e] ecclesiastical shield." *Id.* at 407. More importantly, the court looked to dictionary definitions of "spirit" and "Satan" and concluded that "the phrase 'spirit of Satan' has meaning in a secular, as well as sectarian, context." *Id.* at 407–08. Therefore, the court held that the plaintiff's claim of defamation should not have been dismissed on First Amendment grounds. *Id.* Based upon the holding in *Kliebenstein,* West argues that the phrase "evil spirit" has a meaning that is

even more secular than the phrase "spirit of Satan."

The adjective "evil" is defined in the Oxford English Dictionary as, "The antithesis of GOOD, in all its principal senses," "Bad in a positive sense," "morally depraved, bad, wicked, vicious." [6] The Mirriam–Webster Dictionary defines evil as "morally reprehensible: sinful, wicked" and "arising from actual or imputed bad character or conduct." [7] At the very least, the adjective "evil," has "meaning in a secular, as well as sectarian, context." *Kliebenstein,* 663 N.W.2d at 408. Thus, the phrase "evil spirit" could be considered defamatory in a secular sense. *See id.*

Wadlington's email, although it may have originally been intended to be viewed by Church officials, was sent to a much broader audience of eighty-nine recipients. This email clearly contains some religious accusations which cannot properly be analyzed by a civil court in a defamation suit. However, the email also contains several accusations which could be considered defamatory even in a purely secular context.

The Defendants' last argument is that the statements in the letter should be viewed in context, i.e. a letter to church officials about a fellow church member. In other words, the Defendants claim that even those portions of the letter that could be considered in a secular context should not be considered in a secular context because the actual context is a religious one. Although we are not wholly unsympathetic to the Defendants' concerns, we are unable to agree. The Defendants' argument, taken to its logical conclusion, would allow someone to shield any number of defamatory statements simply by framing them in the context of a religious dispute. We believe that a properly-instructed jury could view Wadlington's letter and decide whether the statements are defamatory in a secular sense.

Under these facts and circumstances, West's action against the Defendants should not have been dismissed. The judgment of the trial court is hereby reversed, and the cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

BAILEY, J., and BARNES, J., concur.

---

**6.** *Oxford English Dictionary* (2d ed.1989), available at http://dictionary.oed.com/cgi/entry/50079151.

**7.** *Mirriam–Webster Online,* http://www.mirriam-webster.com/dictionary/evil[1].